COMPAGNIA DI NAVIGAZIONE MAU-RITIUS ROME, as Owner of THE M/S MALMOHUS, Libelant,

v.

Manuel KULUKUNDIS and Paragon Oil Company, Inc., Respondents,

and

Intramar S.A. and Republic Tankers, S.A., Respondents-Impleaded.

INTRAMAR S.A., Libelant,

v.

105,803.79 BBLS. OF FUEL OIL, etc., Respondent.

INTRAMAR S.A., Libelant,

v.

REPUBLIC TANKERS, S.A., and Para-gon Oil Company, Inc., Respondents.

Nos. A 20067, A 20010, A 20161.

United States District Court
E. D. New York.

June 22, 1959.

Nelson, Healy, Baillie & Burke, New York City, Allan A. Baillie, New York City, of counsel, for libelant.

Bigham, Englar, Jones & Houston, New York City, Sheldon A. Vogel, New York City, of counsel, for Intramar S.A.

George J. Hammerman, New York City, for Republic Tankers, S.A., and Paragon Oil Co., Inc.

MOORE, Circuit Judge (sitting by designation).

Three suits in admiralty brought to recover demurrage have been consolidated for purposes of trial. The principal libel was filed by the owner of the vessel Malmohus to recover demurrage due in accordance with clause 11 of Part II of its charter party. The owner brought its libel against both its charterer Manuel Kulukundis and the consignee of the cargo Paragon Oil Company, Inc. Subcharterers were impleaded.

Paragon's principal defense was breach of warranty of seaworthiness, in that the vessel's slow discharge rate and the cargo's contamination were due to libelant's failure to use due diligence in preparing the vessel.

The question is which, if any, of the parties is liable for demurrage charges pursuant to the respective charter parties. Consideration of the testimony, the exhibits, the briefs submitted and the applicable principles of law leads to the following findings and conclusions.

### Findings of Fact

1. Libelant, Compagnia Di Navigazione Mauritius Rome, an Italian corporation, owner of the Italian flag vessel Malmohus, chartered that vessel for a series of voyages to Manuel Kulukundis, an individual with an office and place of business in the City of New York, under a charter party dated January 9, 1951. (Exhibit 1.)

2. Manuel Kulukundis, by charter party of the same date, sub-chartered the vessel on terms similar to his charter party with libelant to Intramar S.A., a Swiss corporation.

3. Intramar sub-chartered the vessel to Republic Tankers, S.A., a Panamanian corporation, by charter party dated July 23, 1952, and Republic Tankers then sub-chartered the vessel for a single voyage to Paragon Oil Company, Inc., a New Jersey corporation with a place of business in Brooklyn, New York, by charter party dated July 24, 1952.

4. The three charters in evidence are all in Warshipoilvoy form, but those between Compagnia Di Navigazione Mauritius Rome (referred to as "libelant") and Kulukundis and between Kulukundis and Intramar specified 144 hours total laytime in running hours, with demurrage of $135 per hour thereafter, whereas the

charter between Intramar and Republic specified only 72 hours laytime and demurrage of $180 per hour. There are no other material variations in the charters.

5. The pertinent provisions of the charter party (Exhibit 1) are:

"1. Warranty. The Owner shall, before and at the commencement of the voyage, exercise due diligence to make the Vessel seaworthy, properly manned, equipped, and supplied for and during the voyage, and to make the pipes, pumps, and heater coils tight, staunch, and strong and in every respect fit for the voyage, and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation."

"4. Notice of Readiness and Commencement of Laytime. When the Vessel has arrived at the port of loading or discharge and is ready to load or discharge, a notice of readiness shall be tendered to the Charterer or its agent by the Master or Agent by letter, telegraph, wireless or telephone. The Vessel shall be deemed ready within the meaning of this clause whether she arrives during or outside of usual business hours, whether she is in or out of berth or whether or not she has ballast water or slops in her tanks. Laytime shall commence either at the expiration of six (6) running hours after tender of notice of readiness, Vessel in or out of berth, except that any delay to the Vessel in reaching her berth caused by the fault of the Vessel or Owner shall not count as used laytime; or immediately upon the Vessel's arrival in berth (i. e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf) with or without notice of readiness, whichever first occurs."

"5. Laytime. The number of running hours specified as laytime in Part I shall be permitted the Charterer for loading, discharging, and used laytime; but any delay due to breakdown or inability of the Vessel's facilities to load or discharge the cargo within the time allowed shall not count as used laytime. If regulations of the Owner prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee, or the port authorities prohibit loading or discharging at night, time so lost shall count as used laytime. The Vessel shall have the right to sail from all ports immediately upon the completion of loading or discharging whether or not laytime has expired."

"11. Demurrage. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because of fire or explosion in or about the plant, or because of breakdown of machinery or loading or discharging facilities of the Charterer, shipper or consignee of the cargo, the rate of demurrage shall be reduced to one-half the rate stipulated in Part I hereof per running hour and pro rata of such reduced rate for part of an hour for demurrage so incurred."

"17. Heating. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested. Notwithstanding any other provision herein the Owner shall not be responsible if such temperatures are not maintained by reason of any cause beyond the Owner's control and the laytime and demurrage provisions herein shall remain in full force and effect. The burden of proving the failure to exercise due diligence shall be on

the Charterer or person claiming damage or other relief. Whenever the Owner's failure to maintain temperatures is excused under this or any other provision of this Charter, Charterer shall assume all risks of delay during discharge due to the nature or condition of the cargo and shall pay demurrage if any."

"18. General Exceptions Clause. * * * And neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise in this Charter expressly provided, be responsible for any loss of or damage or delay to or failure to discharge or deliver the cargo arising or resulting from:—Act of God; act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strikes, lockouts, stoppage or restraint of labor from whatever cause whether partial or general; or riot or civil commotion. No exemption afforded the Charterer under this clause shall relieve the Charterer of or diminish its obligations for payment of any sums due the Owner under other provisions of this Charter."

6. The voyage in issue commenced at Tampico, Mexico, where the vessel, in seaworthy condition, docked for loading at 1858, January 17, 1953.

7. Ballast was discharged from 2120, January 17 to 0920, January 18, 1953. Loading operations were completed at 1405, January 19, 1953, with 105,083.79 bbls. of No. 6 oil on board. The Malmohus departed from Tampico in seaworthy condition at 1925 on January 19, 1953.

8. Laytime used at Tampico was 31 hours 7 minutes (a minor difference of 47 minutes between the parties is resolved in favor of this amount of time).

9. En route Tampico to New York the vessel encountered heavy weather, and sustained fractures in the hull which admitted some sea water to, and permitted oil to escape from, at least two cargo tanks. Some of the vessel's heating coils were damaged so that fresh water, in the form of steam, was allowed to enter, and oil was permitted to escape from, at least one cargo tank.

10. The vessel anchored in Quarantine at New York at 0938, January 27, 1953. Notice of readiness to discharge cargo was given at approximately 0940, but Quarantine clearance was not granted until 1045. Laytime commenced running at 1645.

11. Having awaited a favorable tide, the vessel proceeded to Paragon's dock at Newark, and moored at 2025. Discharge of cargo commenced at 2115, January 27, 1953 and continued until 1900 the following evening, when Paragon ordered the vessel to anchor off Staten Island and complete the discharge into barges provided by Paragon. During this period the Malmohus discharged 43,685.21 barrels of oil.

12. The reason for the change in unloading procedure was that, due in part to the damaged condition of her heating coils and the resultant relatively low temperature of the cargo, the vessel discharged at a rate which Paragon regarded as unsatisfactory, especially since there were other ships waiting to discharge at the same dock, and a tug and barge strike was rumored to begin at midnight, January 31. At this time Paragon had sufficient tank space to accommodate the balance of the cargo.

13. None of the charter parties contain any representation as to the pumping rate or capacity of the Malmohus.

14. The 43,685.21 bbls. of cargo discharged at Newark were not contaminated.

15. The vessel discharged into barges during January 29 and until 1905, January 30. Paragon then ordered the barges to stop receiving oil because water contamination had been discovered in the cargo, some of which had been transferred to Paragon's shore tanks at Greenpoint, Brooklyn.

16. When discharge of cargo was stopped by order of Paragon at 1905 on January 30, 1953, there remained on board the Malmohus approximately 20,-340.05 barrels of oil belonging to Paragon.

17. From records of E. W. Saybolt & Co., a petroleum inspection company employed by Paragon, it appeared that the Malmohus averaged 2,065 barrels per hour during the time that she discharged at Paragon's Newark terminal, and that the vessel averaged 1,600 barrels per hour in discharging the remaining cargo into barges.

18. Had discharge of cargo continued even at the rate then being experienced there was more than enough time to have completed discharging the entire cargo of oil from the Malmohus within the permitted laytime and before the tug and barge strike was due to commence.

19. A strike of tug and barge workers began at midnight, January 31, and continued until on or about February 11, 1953.

20. Paragon tried unsuccessfully from the afternoon of January 30, 1953, until on or about February 12, 1953, to find storage space or a purchaser for the approximately 20,000 bbls. of contaminated oil remaining on board the vessel.

21. On February 12, 1953, Socony Mobil Oil Company, Inc., agreed to purchase the remaining cargo, and one of its barges took delivery, the Malmohus being completely discharged at 0710, February 13, 1953.

22. Used laytime at Tampico was 31 hours 7 minutes. Used laytime at New York was 398 hours 25 minutes. The excess of total used laytime over the 144 hours allowed in the first two charters was 285 hours 32 minutes. Excess over the 72 hours provided for in the charter between Intramar and Republic was 357 hours 32 minutes.

23. Any liability of the Malmohus and/or libelant for loss of or damage to cargo has been settled, libelant having paid respondent Paragon Oil Company, Inc., the sum of $35,000, and respondent Paragon Oil Company, Inc., having released libelant from all further claims in connection with said loss and damage.

## Discussion

There is adequate factual support for the premise that the Malmohus was seaworthy when it loaded at Tampico; that uncontaminated oil was pumped aboard; that during the voyage to New York heavy weather caused damage to the heating system of the Malmohus and contamination by water of a substantial amount of oil; that as a result of the lower temperature of the oil the hourly rate of pumping was not as rapid as it would have been otherwise; that the election to cease pumping in Newark was made by Paragon; that the election to cease pumping into barges was also made by Paragon; that Paragon made the decision to leave some 20,000 barrels of oil aboard the Malmohus in preference to putting contaminated oil into its tanks; and that a large amount of demurrage was incurred thereby.

What principles of law govern the creation of liability, if any, under these circumstances? Paragon stresses the low temperature of the cargo and slow rate of discharge as excusing its failure to take delivery within the allowed laytime. Clause 5, above, merely allows a deduction from used laytime for time lost due to breakdown of the vessel's facilities; clause 17 preserves the owner's right to demurrage where he has exercised due diligence to maintain the temperatures requested.

Proof of fault is not required to establish liability for demurrage; proof of failure to perform within the allowed laytime is generally sufficient. There are some exceptions, namely vis major, Crossman v. Burrill, 1900, 179 U.S. 100, 21 S.Ct. 38, 45 L.Ed. 106, and where the delay is the fault of libelant or one for whom he is responsible, United States v. Atlantic Refining Co., D.C.D.N.J.1951, 112 F.Supp. 76.

The obligation of the owner as defined in the charter was "before and

at the commencement of the voyage * * * to make the Vessel seaworthy * * * " (Exhibit 1). Proof of unseaworthiness at the port of discharge does not establish such a condition at the time of sailing. Nor does damage to cargo relieve Paragon of its liability to pay freight and demurrage. This undertaking in the charter is an independent obligation and is not discharged because of failure to deliver the cargo in good condition, Arrow Petroleum Co. v. Johnston, 7 Cir., 1947, 162 F.2d 269. The owner of the cargo has his remedy in a claim for cargo damage. This remedy Paragon has exercised here and received $35,000 in settlement. The ship owner having satisfied its liability to Paragon it is but fair that Paragon satisfy its liability to pay freight and demurrage. The two contributing factors were the contamination and the strike. For the contamination there has been compensation. The decision not to put the contaminated oil in its own tanks was Paragon's. Any consequences of this decision were part of the damage claim or were Paragon's responsibility. The strike remains for consideration.

Generally, "the risk of vicissitudes which prevent the loading or discharge of cargo within the stipulated lay days lies unconditionally with the charterers". The three exceptions have been stated to be "(1) specific exonerating clauses in the charter party; (2) the delay being attributed to the fault of the shipowner or those for whom he is responsible; and (3) a vis major amounting to 'a sudden or unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers.'" United States v. Atlantic Refining Co., supra, 112 F.Supp. at page 80.

As to exception (1) there are no specific exonerating clauses in the charter parties. The general strike exception clause found in paragraph 18 "General Exceptions Clause" is insufficient to stop demurrage (Yone Suzuki & Co. v. Central Argentine Railway, 2 Cir., 1928, 27 F.2d 795; Continental Grain Co. v. Armour Fertilizer Works, D.C.S.D.N.Y. 1938, 22 F.Supp. 49). With respect to (2) there was no proof of "fault". As to (3) any "*vis major*" was entirely lacking. The interruption in unloading was due entirely to Paragon's business decision, i. e., to risk a loss on the contaminated cargo or a loss on demurrage.

The liability for demurrage is fixed in the respective charter parties in evidence. This obligation attaches to each respondent which chartered the Malmohus and thereby agreed to pay demurrage at the stipulated rates. The charter party between Republic and Paragon was not offered in evidence; nor was the bill of lading issued by the Malmohus to Paragon. However, Paragon both in the pleadings and by stipulation admits that the charter party between Republic Tankers and Paragon was identical with the charter party between Intramar S.A. and Republic Tankers, S.A., except for names of parties and other provisions not material to the issues herein.

### Conclusions of Law

1. The contracts of charter party involved in this action are maritime in nature and are within the admiralty and maritime jurisdiction of the United States and of this court.

2. There is no warranty expressed in the charter parties or implied by law requiring the Malmohus to have been seaworthy when tendering notice of readiness to discharge at New York after completing her voyage from Tampico, Mexico.

3. The arrival of part of the cargo in a damaged condition did not relieve respondents of the obligation of taking delivery of cargo as required by the terms and conditions of the respective charter parties.

4. Pursuant to Article 18 of all charters the obligation of the charterer to pay demurrage was not excused by the occurrence of the strike on January 31, 1953.

**264**

5. The amount of laytime in excess of that permitted in the charter party between Compagnia Di Navigazione Mauritius Rome and Manuel Kulukundis was 285 hours 32 minutes which at the charter party rate of $135 an hour amounts to $38,547.

6. The same amount of excess laytime is found under the sub-charter party between Manuel Kulukundis and Intramar S.A. for which respondent Intramar S.A. is liable to respondent Manuel Kulukundis.

7. The amount of excess laytime under the sub-charter party between libelant Intramar S.A. and respondent Republic Tankers, S.A., was 357 hours 32 minutes for which libelant Intramar S.A. is entitled to recover from respondent Republic Tankers, S.A., demurrage at the rate of $180.

8. The amount of excess laytime under the sub-charter party between respondent Republic Tankers, S.A. and respondent Paragon Oil Company, Inc., was 357 hours 32 minutes for which respondent Republic Tankers, S.A. is entitled to recover from respondent Paragon Oil Company, Inc., demurrage at the rate of $180.

9. Libelant Compagnia Di Navigazione Mauritius Rome is entitled to a decree against respondent Manuel Kulukundis for the sum of $38,547 together with interest at 3% thereon from February 13, 1953 and costs.

10. Respondent Manuel Kulukundis is entitled to a decree against respondent-impleaded Intramar S.A. for the sum of $38,547 together with interest at 3% thereon from February 13, 1953 and costs.

11. Libelant Intramar S.A. is entitled to a decree against respondent-impleaded Republic Tankers, S.A., for the sum of $64,356 together with interest at 3% thereon from February 13, 1953 and costs.

12. Respondent Republic Tankers, S.A., is entitled to a decree against respondent Paragon Oil Company, Inc., for the sum of $64,356 together with interest at 3% thereon from February 13, 1953 and costs.

Settle decree on notice.