**ASSOCIATED METALS AND MIN-ERALS CORP.**

v.

**4,000 ODD TONS OF MAGNESIUM and Hellenic Lines, Ltd.**

No. 4915.

United States District Court, D. Maryland.

Feb. 14, 1972.

R. Roger Drechsler, Baltimore, Md., and Vincent J. Ryan and Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff.

Manfred W. Leckszas, Baltimore, Md., and Raymond A. Connell, New York City, for defendant.

NORTHROP, Chief Judge.

Once again within a relatively short period of time,[1] this Court is called upon to set a new course in a previously uncharted area of admiralty law. The facts which give rise to this action are relatively simple, the parties having agreed upon all the material facts save one (see Part III of this opinion, *infra*), leaving for our resolution what appears to be a single novel question of law.

I.

Hellenic Lines, Ltd., at the time in controversy, operated vessels in liner service from U.S. ports to Far-Eastern ports, including Indian West Coast ports. One of the vessels in such service during the period of June through August, 1965, was the M/S HELLENIC SAILOR; another was the M/V HELLENIC SKY. At this time, plaintiff, Associated Metals and Minerals Corp. (hereinafter "Associated") was engaged in the business of purchasing, for shipment to U.S. customers, manganese ore. This ore was shipped from ports such as Bombay through an Indian Government corporation, the Minerals and Metals Trading Corporation.

On June 25, 1965, Associated and Hellenic entered into a contract for the carriage of 4000 long tons, more or less, of manganese ore in bulk from Bombay to Baltimore, at a freight rate of $11 per ton, shipment to be made per "M/S HELLENIC SAILOR or substitute." The contract contains a short provision the meaning of which has been the source of the entire controversy between the parties. This provision is to be found in the Conditions section of the contract, and reads "Customary Quick Load." *See*, Stipulation Exhibit A.

It has been stipulated that "During the summer months (June-August) it is not unusual for heavy monsoon rains to cause congestion at Indian ports, including Bombay." Agreed Statement of Facts, Item 7. There is evidence that when the port of Bombay is so congested, ships awaiting berths are assigned berths by the local port authority (the Bombay Port Trust) on a first-come, first-served basis. Answers of G. P. Ooman to Defendant's Interrogatory No. 8. The M/S HELLENIC SAILOR arrived in port at Bombay from Karachi at 1130 hours on July 12, 1965, it having proceeded to Bombay from Karachi for the sole purpose of picking up the Associated cargo. Agreed Statement of Facts, Items 6 and 8. Notice of readiness to load was promptly tendered by the HELLENIC SAILOR. It is stipulated that, at the time notice was tendered, the waiting time for a loading berth was from ten to fourteen days. Agreed Statement of Facts, Item 8. It is stipulated that

> In view of the delay in proceeding to berth for loading, Hellenic ordered the M/S HELLENIC SAILOR to leave Bombay, and the said vessel accordingly sailed from Bombay at 1330 hours, July 13, 1965  .   .   . .

[Agreed Statement of Facts, Item 9]. Thus, the time spent by the SAILOR awaiting a loading berth in Bombay was twenty-six (26) hours.

In the wake of the departure of the SAILOR, Associated negotiated with a number of shipowners, including Hellen-

1. See the opinion of this Court in In Matter of Complaint of Harbor Towing Corporation, 335 F.Supp. 1150 (1971).

ic, to arrange an alternate mode of transportation for the manganese cargo. As a result of this negotiation, it was agreed between Hellenic and Associated that the cargo would be carried on the M/V HELLENIC SKY, at a freight rate of $13 per ton. Additionally, a cargo of 1000 long tons of ferro-manganese ore (a cargo not at all involved in the SAILOR contract) was to be carried on the SKY at the rate of $13 per ton for delivery to New Orleans. The SKY contract, perhaps as the result of a lesson learned from the SAILOR episode, made specific provision for laytime on loading, very clearly providing "Laytime at loading is to commence 24 hours after Master tenders notice of readiness *whether in berth or not* unless sooner commenced." Stipulation Exhibit B (emphasis added). Further, demurrage was set at "$1500 daily half despatch on laytime saved." It should be noted that the last paragraph of the SKY booking note (Stipulation Exhibit B) "purporting to cancel the booking on the M/S HELLENIC SAILOR was not agreed to by ASSOCIATED, who so advised HELLENIC by reply Telex [Stipulation Exhibit B–1]." Agreed Statement of Facts, Item 11. Pursuant to the booking note, the SKY loaded the manganese and ferro-manganese at Bombay, earning a certain amount of demurrage. The manganese ore was delivered to Baltimore, and discharged in less time than the time for discharge allowed in the contract. The SKY then proceeded to New Orleans to discharge the ferro-manganese, and there the discharge time exceeded· the time allowed, the vessel thereby earning demurrage. Associated paid 80% of the freight due on the Baltimore-bound manganese, but has not paid the balance. It has also paid 80% of the freight due on the New Orleans ferro-manganese.

## II.

The legal issue presented by the foregoing facts is relatively simple, *viz.,* Did Hellenic breach the contract of June 25, 1965 (the SAILOR contract) by or-dering the SAILOR to leave Bombay without the manganese cargo some 26 hours after her arrival, in consequence of the expected berthing delay of ten to fourteen days? In order to resolve this issue, the Court must discover the interpretation of the contract term "Customary Quick Load." Associated contends that this term does not put the risk of time lost awaiting berthing for loading upon the shipper (or charterer). Hellenic contends that it means that the shipper or charterer has an obligation to provide immediate berthing for the ship. The theory apparently is that the provision of immediate berthing is a condition upon the carrier's duty to carry the cargo; if immediate berthing is not provided, the condition is broken and the vessel owner is discharged from his duties under the contract, thereby leaving the vessel free to sail away without the cargo. We disagree with this contention, and hold that whether or not the term "customary quick load" puts the entire burden of loss caused by berthing delay upon either the shipper *or* the vessel owner, it does not set up an escape hatch for the owner whereby he can avoid the contract after awaiting berthing for little more than a day, especially where the delay in berthing, as here, was the result of the port policy of first-come, first-served coupled with an expectable congestion and consequent delay on account of natural factors of which all parties were or should have been aware. We purposely narrow our holding insofar as the point involved here is novel, and we do not mean to set forth an interpretation of "customary quick load" applicable to all ports and all conditions of contracting.

This Court has not found, and counsel have not cited, any cases which have construed the term "customary quick load." The cases which construe a similar phrase, "customary quick dispatch," besides being of ancient vintage, almost all seem to deal with unloading, rather than loading of cargoes. *See, e. g.,* Freeman v. Wellman, 67 F. 796 (D.Mass. 1895). It seems that the phrase "cus-

tomary quick dispatch" is to be given the same meaning as the phrase "quick dispatch." 80 C.J.S. Shipping § 210(2) (1953). The cases collected at § 210 of the C.J.S. Shipping article which construe the term "quick dispatch" deal with the unloading, rather than the loading, of the vessel, thus giving no clue to the resolution of the issue before us. As for loading, the cases collected at 80 C.J.S. Shipping § 209 stand merely for the proposition that the shipper is liable in damages for demurrage or detention (if no demurrage is specified in the contract) on an almost absolute basis where he has undertaken in the contract of carriage to load the vessel within a time certain, but has failed to do so. If the contract does not have such an express undertaking, the shipper must load in a reasonable time, and will be liable in damages for unreasonable delays in loading. Thus, the question in the instant case is whether the term "customary quick load" altered the obligation of Associated to load in a reasonable time to an obligation to load immediately upon arrival of the SAILOR in port.

We have turned for some enlightenment on the question to the venerable treatise, Scrutton on Charter Parties (17th ed. 1964) (hereinafter cited as *Scrutton*). In that work, the question of loading obligations is approached from the standpoint of determining when a shipper is liable for detention (in the absence of a clause fixing demurrage damages) due to a delay in loading. *Scrutton* states:

Damages for detention (when demurrage is not provided for) become payable . . . :

(2) On the expiration of a reasonable time for loading . . . when no laydays are specified [*Scrutton*, p. 309].

According to the learned Scrutton, it is very difficult to alter contractually the obligation to load within a reasonable time in such fashion as to impose an obligation on the shipper to load more quickly, much less than to impose a load-ing obligation upon him immediately upon the ship's arrival in port, as Hellenic seeks to do in this case with its construction of the "customary quick load" clause. For example, in the case of Bargate Co. v. Penlee Co. (1921), 26 Com.Cas. 168, it was held that the obligation to load or discharge within a reasonable time was not altered by so drastic a clause as "time is to count on arrival of the steamer." Although this Court is not willing to go so far as did the *Bargate* court in holding the reasonable time obligation beyond the reach of contractual modification, we do not think the language "customary quick load" was strong enough to impose a duty upon Associated to load immediately upon SAILOR's arrival in Bombay. *Cf.* Hulthen v. Stewart (1903) A.C. 389 and Postlethwaite v. Freeland, (1880), 5 App.Cas. 599.

Certainly, the language in the HELLENIC SKY booking note (Stipulation Exhibit B) to the effect that "Laytime at loading is to commence 24 hours after Master tenders notice of readiness whether in berth or not . . ." is strong and explicit enough to cast the risk of non-availability of berth space unequivocally upon the shipper or charterer. That contract, however, was the result of the hindsight, rather than the foresight, of the parties. Of course, the shipowner is not totally without a remedy even though the "customary quick load" clause is not the strong medicine he thinks it might be. If loading is delayed beyond a reasonable time, he always has his common-law remedy of damages for detention (which, of course, can be contractually liquidated as demurrage). Or, the shipowner can take the wiser course of inserting an express provision as to laytime on loading such as Hellenic inserted in the SKY booking note. *Cf.* Intercontinental Transportation Co. v. India Supply Mission, 261 F. Supp. 757, 759 (S.D.N.Y.1966). At any rate, we are certain that the "customary quick load" clause does not give the shipowner the right to order his vessel to leave port twenty-six hours after its

arrival in consequence of an expected berthing delay, especially where the delay is known to occur with seasonal regularity. Thus, Hellenic Lines breached the contract of affreightment between it and Associated Metals dated June 25, 1965.

### III.

■ Counsel for Hellenic argues that regardless of its breach *vel non* of the June 25, 1965 contract, Associated cannot prevail in this action insofar as there is no proof that it had cargo ready and waiting to be loaded on the SAILOR upon her arrival in port at Bombay. Whether or not the physical presence of cargo at berthside is a condition precedent or concurrent to the shipper's obligation under a contract of affreightment to carry the freight, there is clearly evidence in the record (although not stipulated to) that the manganese cargo was physically present and available for loading when the SAILOR arrived at the port of Bombay. Cross-examination by Hellenic (on deposition) of the witness Henry Pohl, in 1965 the Manager of the Ores Department of Associated, elicited the following colloquy:

Q Under your freight contract with Hellenic Lines, contract of June 25, 1965, involving the HELLENIC SAILOR, the shipper's obligation of loading the cargo aboard the vessel. Did you receive any written communication from Minerals and Metals Corporation to the effect that the cargo was available at Bombay and ready to be loaded aboard the vessel?

A Yes.

Q May I see the communication? [Whereupon there was a discussion off the record.]

A I do remember that we got telexes. [Deposition of Henry Pohl taken March 12, 1971, p. 10].

Thus, the testimonial evidence of Mr. Pohl (given on cross-examination upon oral deposition) would satisfy the plaintiff's burden of proof on this issue, and we find as a fact, in the absence of any proof whatever to the contrary, that the manganese cargo was available upon the SAILOR's arrival in Bombay; this certainly is a permissible inference from the fact that telexes confirming this availability were sent Associated by the Indian Government corporation, Minerals and Metals Corporation.

### IV.

■■ On the issue of damages, it is the opinion of this Court that ordinary contract damages are due Associated for Hellenic's breach of the June 25, 1965 contract of affreightment. In consequence of Hellenic's breach, Associated is clearly entitled to the benefit of its bargain, *viz.*, carriage of the manganese ore from Bombay to Baltimore at the rate of $11 per ton. When shipped via the HELLENIC SKY, the freight rate for the manganese ore was $13 per ton. Associated paid 80% of the freight calculated at $13 per ton, that is, $45,749.60. Agreed Statement of Facts, Item 16, as amended. Carriage of a like amount of manganese ore at $11 per ton would have resulted in a net freight bill of $46,149.14. As a result of Hellenic's breach, Associated was entitled to carriage of its cargo at the $11 rate, but it did not become entitled to a windfall. Thus, we must reject Associated's contention, asserted in its amended trial memorandum, that it is entitled to damages in the amount of the difference between the *entire net freight* ($55,-938.35) due under the SKY $13-per ton contract and the net freight which it would have paid at the rate of $11 per ton ($46,149.14), this difference amounting to $9,789.21. This contention must be rejected for the simple reason that Associated is not out-of-pocket in the amount of $55,938.35, but only in the amount of 80% of that sum, *viz.*, $45,749.60; thus, there has been no damage in the amount of $9,789.21. Rather, it is Associated which is indebted to Hellenic in the amount of $399.54, that sum being the difference between

the sum which it would have cost Associated to ship the manganese at $11 per ton ($46,149.14) and the sum which it actually paid towards the freight calculated at the $13 per ton rate, $45,749.60. Simply stated, then, we find that Associated was entitled to the benefit of its bargain ($11 per ton rate), and no more.

To the sum of $399.54 still owing Hellenic must be added certain additional amounts. On loading at Bombay, the SKY was detained nine days sixteen hours two minutes beyond allowable laydays, which, at the rate provided for in the SKY booking note, gives rise to demurrage of $14,500. It will be remembered that the SKY carried both the manganese originally to have been shipped via the SAILOR, and an additional cargo of ferro-manganese for shipment to New Orleans. Associated contends, and rightly so, that only demurrage on loading calculated with regard to the ratio which the tonnage of ferro-manganese bore to the total tonnage of manganese and ferro-manganese loaded is chargeable against it. This contention is correct for the reason that there would have been no demurrage attributable to the SKY loading of manganese had not Hellenic breached the SAILOR contract; hence, any demurrage attributable to the *loading* of manganese is an expense chargeable to the fault of Hellenic. Ferro-manganese comprised 19.5% of the total cargo lifted by the HELLENIC SKY, and 19.5% of $14,500 is $2827.50. This sum must be added to the $399.54 which Associated owes Hellenic for the carriage of the manganese (figured at $11 per ton, see above), thus increasing that sum to $3227.04. This amount must further be increased by $1288.48 for demurrage due to delay in unloading the ferro-manganese at New Orleans, thus increasing the total due Hellenic to $4515.52. Finally, Associated still owes net freight on the ferro-manganese cargo of $462.33. Agreed Statement of Facts, Item 17. This sum, added to the sum of $4515.52, creates a total balance owing Hellenic of $4977.85. However, insofar as Associated was diligent in unloading the manganese cargo at Baltimore in less time than the number of laydays provided in the SKY booking note for such unloading, it is entitled to a credit of $5335.65 representing a discharge allowance. We think this sum is recoverable for the reason that there is no indication that an equal amount of time would not have been saved had the SAILOR contract been performed, and, Associated, being entitled to the benefit of its bargain, and having seen to it that the manganese, once it finally arrived in Baltimore, was unloaded in an expeditious fashion, should be entitled to the discharge allowance provided for *explicitly* in the SKY booking note. Thus, subtracting the amount which Associated owes Hellenic ($4,977.85) from the discharge allowance ($5,335.65), the account between the parties boils down to the sum of $357.80 owing to Associated by Hellenic.

Judgment accordingly will be entered in favor of plaintiff, Associated Metals and Minerals Corp. against defendant, Hellenic Lines, Ltd., in the sum of $357.80, with interest from September, 1965 and costs of this action, and judgment will be entered in favor of the plaintiff and counter-defendant, Associated Metals and Minerals Corp. on the compulsory and permissive counterclaims of defendant and counter-plaintiff, Hellenic Lines, Ltd.