**BRENNAN CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 85–2531.

United States District Court, District of Columbia.

July 10, 1986.

Robert N. Kharasch, Mark T. Priesing, Galland, Kharasch, Morese & Garfinkle, P.C., Washington, D.C., for plaintiff.

David V. Hutchinson, Mee Lon Lam, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

In this proceeding, plaintiff Brennan Corporation ("Brennan") presents a damage claim for alleged breach of contract arising under a maritime charterparty agreement with the Military Sealift Command ("Sealift Command" or "MSC"). Defendant Sealift Command is a component of the United States Navy. Brennan seeks to recover demurrage which it claims Sealift Command owes under the contract and which plaintiff alleges was caused in part by wrongful acts committed by the Saras Refinery. At the time, the Refinery was acting at the behest of the Sealift Command and in connection with its performance of the charterparty contract with the plaintiff.

Brennan's demurrage claim was resisted by Sealift Command and later denied by the Navy Contracting Officer. After exhausting all administrative avenues of relief, Brennan sought judicial relief before this Court. The trial was conducted without a jury. The matter was fully briefed and otherwise ably presented by counsel.

The Court has reviewed the relevant exhibits, considered the testimony of the several witnesses, including their familiarity or lack of familiarity with maritime customs and practices, and otherwise assessed their credibility. For the reasons set out below, the Court determines that plaintiff Brennan is entitled to relief. In accordance with Rule 52, Fed.R.Civ.P., the required findings of fact and conclusions of law follow.

## FINDINGS OF FACT

### A.

On September 17, 1981, Brennan entered into a tanker voyage charterparty contract (Pl.X–1) with the Sealift Command for the transport of jet fuel cargo, otherwise known as a clean or light petroleum product as opposed to crude oil. A vessel suited for the transport of such cargo is known as a "clean vessel" or a vessel in a "clean trade." The jet fuel cargo was to be transported from among a range of loading and discharging ports, all designated by the Navy. In the performance of the contract, Brennan provided the tanker Messinaki Anatoli ("Anatoli") as the transport vessel, identifying its two immediately prior cargoes and otherwise certifying, as required under the contract, that it was a "clean vessel" previously engaged in a "clean trade." The jet fuel cargo was to be taken on from the Saras Refinery located at the loading port—Sarroch, Sardinia.

On September 18, 1981, the Anatoli arrived at Sarroch, where it anchored and tendered notice of readiness to load. Saras Refinery did not designate a loading berth for the tanker until September 23. The charter contract provided that demurrage was to be charged six hours after the Anatoli tendered notice of readiness and that charges would accumulate until the vessel was berthed. Demurrage penalties are customarily assessed against the charterparty when there are delays to an arrived vessel not attributable to the vessel's fault.

Tankers travel in ballast for safety and stability and, under the practice of the trade, the refinery provides deballasting facilities. The Anatoli's tanks contained ballast water, and the jet fuel cargo could not be loaded until the ballast was discharged.

Prior to the charterparty contract with Brennan, the Navy through one of its components, the Defense Fuel Supply Center ("Center"), had contracted with Saras Refinery to provide deballasting facilities. (Pl.X–13). Plaintiff Brennan was not a party to that contract and indeed had no independent contract with the Refinery. A provision of that contract (Pl.X–13, p. 32, ¶ H52–02) required the Center to provide and pay for deballasting facilities and services to chartered vessels such as the Anatoli. During the period that deballasting services were provided by the Refinery,

Brennan could not · claim demurrage charges against the Sealift Command. Deballasting involves both the tanker and the shore facility. In this situation, Saras Refinery, the shore facility, provided ballast shore lines that were connected to the Anatoli's manifolds, and personnel of the shore facility specified the pressure that the tanker should use in pumping out the ballast. Once the shore lines were connected, the tanker valves were opened and the tanker began pumping out ballast.

During the course of the trial, defendant's attorney attempted to show by cross examination of plaintiff's witnesses that the Anatoli should have had her pumps running before opening the valves. Other than the proffered questions, there was no factual basis whatsoever for counsel's suggestion. Indeed, the unchallenged and credible testimony of plaintiff's expert witness, Ravi Singh, and defendant's shipping adviser, John Caffery (who had had prior, extensive experience in tanker operations) showed that it would be an extremely dangerous practice to begin pumping before the manifold valves are opened. Indeed, their testimony showed that the resulting pressure could have caused serious damage to the ship's lines, or an explosion.

In accordance with normal and acceptable procedures, the Anatoli connected to the shore line provided by the Saras Refinery, and the valves of the tanker were opened. Once that was done, the back pressure in the shore line drove heavy black fuel oil into the Anatoli's clean ballast tanks. When this contamination developed, the Anatoli issued a protest notice of responsibility to the Refinery. The defendant's inspector (Quality Assurance Representative), who was present during the operations, then rejected the Anatoli on grounds that it was not a clean vessel but contained dark fuel oil in several ballast tanks.

### B.

After review of the relevant testimony of the several witnesses presented and examination of their credibility, and after consideration of the Anatoli's ship logs, stipulated to by counsel as to authenticity, a finding is clearly warranted that the Anatoli was a clean vessel and was not contaminated. It was only during the deballasting operations that a contamination problem was found to exist. Indeed, it is undisputed that the last liquid cargo carried by the Anatoli was naptha sulphur, and immediately prior thereto the liquid cargo was clean gas oil. The parties agree that those liquids were clean products or clean cargoes. The Court further finds that the heavy black fuel oil found in the Anatoli's ballast tanks was caused by back pressure into the ballast shore lines provided by and under the control of the Saras Refinery.

Two representatives of the Sealift Command were called by the plaintiff and presented testimony, Lt. Comdr. Louis Henke and John M. Caffery.

Lt. Commander Henke was the Navy Contracting Officer who rendered the decision denying the plaintiff's demurrage claim. He had no prior experience or familiarity with commercial shipping activities of this nature. Moreover, his testimony showed that he made no independent factual determination in denying Brennan's claim. He merely adopted a decision prepared for his signature and did not discuss it with anyone. Henke did not render an independent judgment and made no meaningful inquiry or analysis. Instead, he entered only a few grammatical and stylistic changes to the proposed written decision prepared for his signature.

Mr. Caffery was a shipping adviser and contract specialist on the Sealift Command staff. He came to that position with many years of practical hands-on experience in commercial chartering activities, including tanker loading and unloading and charter-party agreements, involving transportation of jet fuel cargo. While he could not be absolutely certain, he declared that on basis of all available records, ship logs, and his experiences, the tanker was a "clean vessel" when it tendered notice of readiness, when deballasting operations were

commenced, and that in all probability the contamination was caused by the Refinery.

The sole witness called by the government was John McKenna, a marine transportation specialist employed by the Sealift Command with 20 years experience. He negotiated and prepared the original charterparty contract on behalf of the Sealift Command. He also negotiated with the plaintiff for a replacement of the Anatoli and for Amendment No. 1 to the original contract.[1] The amendment, which he prepared, provided for the "substitution" of the tanker Messiniaki Doxa for the Anatoli. He testified that the September 17, 1981 charterparty contract was not cancelled.

Article 26 of the charterparty contract between the parties provided that the Anatoli could be disapproved and rejected "as unacceptable for the carriage of the designated cargo" and that under those circumstances

the Charterer shall have the option of requiring the necessary cleaning by the Owner or to *cancel* [the] Charter without any liability whatsoever in the Charterer.... (emphasis added.)

The decision to disapprove and reject the tanker was in the sole discretion of the "Charterers' Inspector."

While Article 26 provided for cancellation of the original agreement, Amendment No. 1 did not provide for such, but rather, provided for a substitute tanker, the Messiniaki Doxa ("Doxa") in place of the Anatoli. Mr. McKenna testified that during his 20 years of experience with marine transportation matters and transactions of this nature he was familiar with and had on occasions undertaken cancellations of such contracts. He testified further that in this instance a cancellation was not effected but rather an amendment providing for a substitution of vessels was undertaken. He further testified that he had prior experiences in which an amendment to the original agreement provided for substitution of vessels. Nor was the replacement of the Doxa for the Anatoli, based on his years of experience, a constructive cancellation.

In this regard, the testimony of McKenna and plaintiff's expert, Ravi Singh, was consistent. Singh testified that in commercial chartering affairs a substitution is not a cancellation. It is the use of a second vessel in place of the first and the charterers' obligations, including demurrage, run to the second vessel.

Plaintiff's claims for demurrage include the time lost during deballasting operations and the time expended in cleaning the contaminated Anatoli. At the final argument in this proceeding, counsel for the parties stipulated that the demurrage claimed, if due and owing by the defendant, amounted to 110 hours and 50 minutes.

## CONCLUSIONS OF LAW

The parties agree and this Court determines that it has jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, and the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.*, to the extent not inconsistent with the Contract Disputes Act. *Whitey's Welding and Fabrication, Inc. v. United States*, 5 Cl.Ct. 284, 286–87 (1984).

■ It is recognized under charterparty and maritime law that after the Anatoli tendered a notice of readiness, the defendant assumed all risks for delays suffered by the plaintiff. *United States v. Atlantic Refining Co.*, 112 F.Supp. 76, 80 (D.N.J. 1951); *Compagnia Di Navigazione Mauritius Rome v. Kulukundis*, 182 F.Supp. 258, 263 (E.D.N.Y.1959), *aff'd*, 277 F.2d 161 (2d Cir.1960). Once the Anatoli announced a readiness to accept the cargo, the defendant was required to provide a safe berth, to assist in loading the cargo and not to interfere with the Anatoli's efforts in the performance of the loading process. Likewise, the Refinery, acting at the behest of the Sealift Command, had a duty not to prevent the Anatoli from completing the contract. When the Refinery caused the contamination of the Anatoli's ballast tanks, it interfered with the plaintiff's performance of the contract with Sealift Command.

---

**1.** The first-two pages of Pl.X–13 are Amendment No. 1, September 25, 1981.

Substitution of the Doxa for the Anatoli under the charterparty contract did not result in novation of the charterparty. For a novation to have resulted from the September 25, 1981 amendment, the parties must have intended such a result, and their intention should have been expressly stated in the agreement. *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 642–44 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979). The substitution of the Doxa merely provided that it would continue to perform the contract begun by the Anatoli. The substitution of the Doxa did not abrogate the Sealift Command's liability for demurrage on account of the delays that the Anatoli had already experienced. The substitution of the Doxa had no effect upon demurrage charges already incurred associated with the Anatoli. *Cargo and Tankship Management Corp. v. India Supply Mission,* 221 F.Supp. 680, 684–85 (S.D.N.Y.1963), *aff'd in part,* 336 F.2d 416 (2d Cir.1964).

The Navy Contracting Officer, Lt. Commander Henke, did not render an independent, reasoned, and analytical decision as required by the Contract Disputes Act of 1978 and the charterparty contract. *See New York Shipbuilding Corp. v. United States,* 385 F.2d 427, 435 (Ct.Cl.1967); *John A. Johnson Contracting Corp. v. United States,* 132 F.Supp. 698, 705–06 (Ct. Cl.1955). *Cf. Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual,* 463 U.S. 29, 53–56, 103 S.Ct. 2856, 2871–2873, 77 L.Ed.2d 443 (1983).

The government's contention that it had a right to cancel the charterparty contract because the Anatoli had contaminated tanks, irrespective of its origin, cannot be sustained. It should not have the right to cancel the agreement when the Refinery hired by the government to provide the cargo and to provide the deballasting facilities was the source of the contamination. "Charterers cannot, on the one hand, set up a barrier to the vessel's satisfying the charterparty requirements for becoming an arrived ship and then seek to use this same barrier as a defense to avoid payment of demurrage." *Diamantis Gafos,* 1970 American Maritime Cases 945, 948 (Arb.N. Y.1969).

The government rejected plaintiff's claim on the grounds that the substitution amendment did not provide for payment for the accumulated demurrage on the Anatoli. That position mistakes the nature of a substitution and the language of the amendment that provided for a continuation of the original charter. The authorities cited by the government to support its position are inapposite. *See Associated Metals and Minerals Corp. v. 4,000 Odd Tons of Magnesium,* 339 F.Supp. 513, 518 (D.Md.1972); *Morgan v. Garfield & Proctor Coal Co.,* 113 F. 520, 523 (D.Mass. 1902). *Associated Metals* did not involve a substitution. Nor did *Morgan* involve a substitution, but rather a cancellation. The rule of that case is that until there is full performance by the vessel, liability for demurrage is inchoate and, upon cancellation of the charter, any inchoate liability for demurrage is discharged.

The plaintiff has requested attorneys' fees. A consideration of the plaintiff's application is postponed until the matter has been fully briefed by counsel for the parties.

On basis of the above, counsel for the plaintiff shall present an appropriate order within ten (10) days of this date.