**RIVER AND OFFSHORE SERVICES COMPANY, INC.**

v.

**UNITED STATES and Marine Transport Lines, Inc., a/k/a Marine Transport Management, Inc.**

**Civ. A. No. 85–3913.**

United States District Court,
E.D. Louisiana.

Jan. 2, 1987.

William P. Schuler, Chalmette, La., Fred Israel, Charles Raley, James Phillips, Israel and Raley, Washington, D.C., for plaintiff.

William F. Baity, Asst. U.S. Atty., New Orleans, La., Thomas L. Jones, Sr. Admiralty Counsel, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

SEAR, District Judge.

### I. Introduction and Prior Proceedings

Marine Transport Lines (MTL) operates a tanker, the USNS SEALIFT ATLANTIC, under a contract with the United States Navy Military Sealift Command. There is no dispute that this vessel is a "public vessel" within the meaning of the Public Vessels Act, 46 U.S.C. § 781 *et seq.* (PVA). On August 5, 1985 MTL solicited bids for repair and maintenance work on the USNS SEALIFT ATLANTIC. River and Offshore Services Company (ROSCO) submitted a fixed-price bid of $1,555,427.00 for the work and was awarded the contract, which was formalized by a purchase order dated September 9, 1983. ROSCO then awarded a subcontract to Sabine Coating Services (Sabine) to do sandblasting and coating work for $915,000.00.

As work on the vessel proceeded, a series of disputes arose over changes in and the progress of the work. As a consequence MTL allegedly forced ROSCO to replace Sabine with Marine Coatings, Inc. Marine Coatings was more expensive and changing subcontractors allegedly delayed completion of the work. Work on the vessel was not finished within the contractually-specified period. On December 3, 1983 MTL assessed liquated damages against ROSCO in the amount of $522,300.00. After attempting to resolve the matter with MTL, ROSCO brought suit against MTL and the United States seeking return of the liquidated damages, a $736,170.00 unpaid balance under the contract, and $183,870.00 as an "undisputed" contractual obligation.

ROSCO asserts four causes of action against the defendants: (1) for a maritime lien under 46 U.S.C. § 971 and 46 U.S.C. § 742 for materials, labor, services, and other items provided in connection with repair of the vessel; (2) for breach of contract resulting from a failure of the defendants to adjust the contract price because of changes and unavoidable delays; (3) for tortious interference with ROSCO's contract with Sabine; and (4) for prejudgment interest on payments wrongfully withheld. The defendants have filed a motion to dismiss for want of subject matter jurisdiction.

## II. May Marine Transport Lines be Sued by ROSCO?

### A. Contract and Maritime Lien Claims

The defendants begin their argument by contending that under the Suits in Admiralty Act (SAA) and the PVA the plaintiffs are barred from suing MTL. The PVA is subject to § 5 of the SAA. 46 U.S.C. § 782. Section 745 provides that the remedy provided by the SAA "shall ... be exclusive of any other action by reason of the same subject matter against the *agent* or employee of the United States ... whose act or omission gave rise to the claim" (emphasis added). The defendants contend that MTL is an agent of the United States, and that therefore PVA § 782,[1] incorporating SAA § 745, bars suit against MTL.

A long line of cases establishes that a contract operator of a naval vessel such as MTL is an agent of the United States for purposes of SAA § 745. *See, e.g., Doyle v. Bethlehem Steel Corp.*, 504 F.2d 911, 913–14 (5th Cir.1974). Of particular relevance is *Smith v. United States*, 346 F.2d 449 (4th Cir.), *cert. denied*, 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965), which finds an agency relationship in an operating contract (with MTL, in fact) which is quite similar to the operating contract in this case. *Id.* at 451–452. *See also Saf-*

*frhan v. Buck Steber, Inc.*, 433 F.Supp. 129, 133 (E.D.La.1977) (Rubin, J.); *The Mission Santa—Ynez*, 1967 A.M.C. 25, 26–29 (C.D.Cal.1966). These cases uniformly hold contract operators to be agents of the United States so as to bar suit against them under SAA § 745.

There is nothing about the contract between MTL and the U.S. which requires me to treat MTL differently. The contract gives MTL the authority to possess and operate the USNS SEALIFT ATLANTIC on behalf of the government, according to the government's regulations and directions. While no specific clause in the contract identifies MTL as an "agent" (the term "contractor" is used throughout), the contract establishes an agency relationship.

█ Entering into subcontracts on behalf of the government is within the scope of MTL's agency. ROSCO admits this in paragraph number seven of its complaint. Under the contract, MTL is permitted to arrange for subcontractors to do repair and maintenance work on the USNS SEALIFT ATLANTIC. Article 22, section (a) of MTL's contract with the Navy, entitled "Maintenance and Repair," states "Except as herein specifically provided the Contractor [MTL] shall be charged with full responsibility and costs for maintenance and repair of each tanker throughout the period of this Contract...." Section (h) of Article 22 provides:

The Contractor shall be responsible for the full cost of maintenance and repairs which can reasonably be accomplished by the tanker's crews, including the special maintenance riding crews, taking into account the nature of the work, availability of such crews and the operational commitments of the tankers.... Further, the Government shall pay for the cost of all other maintenance and repairs, including parts, which are required to be performed with industrial assistance. The Contractor shall not make repair or main-

---

1. ROSCO does not make clear whether its suit is brought under the SAA or the PVA. Since both statutes bar suit against agents of the United States, I need not concern myself with which applies at this point.

tenance subcontracts, except for special maintenance riding crews, in excess of $10,000 without the prior approval of the Government. The Contractor shall submit to the Government for review and approval all repair specifications prior to issuing to shipyards for bidding....

Article 33, entitled "Default," provides in section (c) that MTL will be liable for the defaults of subcontractors. However, section (g) of the same article provides that this is not the case for subcontractors "with whom the Contractor executes subcontracts at the direction of the Government in accordance with Article 22(h)." The Article 22(h) procedure was used to hire ROSCO. These provisions plainly demonstrate that MTL operated as an agent of the government in contracting with ROSCO.

The suit against MTL with respect to the maritime lien and contract claims is therefore barred by SAA § 745. The consequence of finding an agency relationship between MTL and the government is to place the subcontractor ROSCO in privity of contract with the government. This result conflicts with a well-established line of cases under the Tucker Act upon which the plaintiffs rely. Those cases permit a finding of privity between the federal government and a subcontractor under extremely limited circumstances. Under the Tucker Act privity exists between a subcontractor and the government when the prime contractor "(1) act[s] as a *purchasing* agent for the government, (2) the agency relationship between the government and the prime contractor [is] established by clear contractual consent, and (3) the contract state[s] that the government would be directly liable to the vendors for the purchase price." *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed. Cir.1983) (emphasis in original). Except

for perhaps the second, none of these factors is present in this case.

■ The conflict between the Tucker Act and admiralty law has an impact on the Contract Disputes Act of 1978 (CDA).[2] 41 U.S.C. § 601 *et seq.* The CDA applies to contracts between the government and "a party to a Government contract other than the Government." 41 U.S.C. §§ 601, 602. In determining to whom the CDA applies, the Federal Circuit held that Congress intended to continue prior Tucker Act law limiting government privity with subcontractors to special situations, and that Congress may have meant to bar subcontractor suits altogether. *Johnson Controls,* 713 F.2d at 1549–50. Therefore, were this a Tucker Act claim, ROSCO would be unable to make use of the CDA procedures. Accepting the Federal Circuit's analysis of Congressional intention in *Johnson Controls* as correct, the Congressional desire to limit the government's expense and trouble in defending contract claims by using primary contractors as a buffer between the government and subcontractors[3] conflicts with the SAA policy of shielding from liability those who operate ships on behalf of the government. In resolving conflicting congressional intentions, the longstanding policy of the SAA should not be disturbed. In passing the CDA Congress gave no indication that it intended to alter federal agency law under the SAA. I see no compelling reason why the Tucker Act and the SAA must use the identical test for determining who is an agent of the United States.

Because suit is barred by the SAA, MTL is entitled to summary judgment,[4] dismissing plaintiff's contract and maritime lien claims against MTL.

## B. Tort Claim

■ I reach the same conclusion with respect to the tort claim. ROSCO points

**2.** The CDA applies to maritime contract disputes. 41 U.S.C. § 603. *See, infra* pp. 280–281.

**3.** *See* S.Rep. No. 95–1118, 95th Cong., 2d Sess. 16–17 *reprinted in* 1978 U.S. Code Cong. & Ad. News 5235, 5250–51.

**4.** *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

out that the government may not be bound by the actions of its agents acting beyond the scope of their authority. *See, e.g., Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 383, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947). Then ROSCO asserts, without citing authority, that if the government were to defend against the tort claim by asserting MTL's lack of authority to commit torts, I could not dismiss the tort claim against MTL, which would proceed based on diversity and/or admiralty jurisdiction. While it may seem unfair for the government to bar suit against its agents and then use the agent's lack of authority to defend the suit against itself, the plaintiffs have not demonstrated that Congress could not or has not dictated that result. MTL is entitled to summary judgment on the tort claim as well.[5]

## III. Suit Against the United States

### A. Contract Claim

The first step in analyzing a claim against the United States is to determine whether the United States has waived its soverign immunity and, if so, on what terms.

██ ROSCO does not make clear whether it relies upon the waiver of sovereign immunity in the PVA or the SAA as permitting its suit for contract damages. There is a substantial controversy over whether the PVA provides a waiver of sovereign immunity for contract claims arising out of the operation of public vessels. *See* C. Black and G. Gilmore, *The Law of Admiralty* 980–86 (2d Ed.1975). The difficulty is the language of the PVA, which waives sovereign immunity for damages "caused" by a public vessel. 46 U.S.C. § 781. It is hard to imagine how a vessel can cause a breach of contract. However, if the PVA does not provide the waiver, the SAA will, because the statutes should be read together as placing the government on roughly the same footing as private persons in the maritime industry. *Aliotti*

*v. United States,* 221 F.2d 598, 602 (9th Cir.1955).

Despite this apparent waiver of sovereign immunity, Congress has conditioned the waiver of sovereign immunity with respect to contract claims on compliance with the Contract Disputes Act. *Fidelity Construction Co. v. United States,* 700 F.2d 1379, 1383–84 (Fed.Cir.1983). Under the CDA, disputes between the government and parties to contracts with the government must be submitted to the government contracting officer in charge of the contract. 41 U.S.C. § 605(a). All government contracts, with certain specific exceptions, are subject to the CDA. 41 U.S.C. § 602. Section 605(c) requires that claims over $50,000 be accompanied by certification that the claim is in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable. If this certification is not made, there is no jurisdiction at any level to consider the claim. *Fidelity Construction Co.,* 700 F.2d at 1383–84.

While ROSCO did make a claim for equitable adjustment of the contract price to MTL, it plainly does not meet the requirements of § 605(c). The government contends that ROSCO is thereby barred from bringing this action until it complies with CDA requirements.

ROSCO argues that the CDA does not apply to claims brought under the district court's exclusive admiralty jurisdiction. The Senate Report on the CDA suggests this may be so:

Consideration was also given to having the bill apply to maritime contracts for employment, use, restoration, repair, or salvage of vessels and aids to navigation. Jurisdiction over these contracts arise in Admiralty and presently reside wholly within the Federal district courts. This jurisdiction is not shared by the Court of Claims. A variety of factors militated

---

5. *Bell,* 327 U.S. at 682–83, 66 S.Ct. at 776. Dismissal of the tort, contract and maritime lien claims necessarily results in dismissal of the claim for prejudgment interest against MTL.

against the inclusion of such contracts within the bill.

Jurisdiction over matters arising in admiralty including maritime contracts has vested exclusively with the Federal district court since 1920. As a result, the district courts have developed an expertise in admiralty matters, which has resulted in a common body of procedural and substantive law, applicable to private litigants and the United States alike. Inclusion of marine contracts within the bill would have created an exception to the district courts' otherwise exclusive admiralty jurisdiction and divided maritime contract disputes between the Court of Claims and district courts depending on whether the United States was a party plaintiff or defendant. Admiralty matters sounding in contract involve issues and procedural questions considered sufficiently unique so as to warrant the continued maintenance of these actions within the exclusive jurisdiction of the district court.

S.Rep. No. 95–1118, 95th Cong., 2d Sess. 18, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5235, 5252 (citations omitted).

 While this passage may appear to conclude the issue in favor of ROSCO, the section of the bill to which the passage refers reads "Appeals under paragraph (g) of section 607 of this title and suits under section 609 of this title, arising out of maritime contracts, shall be governed by chapter 20 [SAA] or chapter 22 [PVA] as applicable, to the extent that those chapters are not inconsistent with this chapter." 41 U.S.C. § 603. Section 607 (g) vests appeals from agency boards of contract review in the United States Court of Appeals for the Federal Circuit. Section 609 permits one to bypass agency boards of contract review and appeal contract claims from lower administrative bodies directly to the United States Claims Court. Therefore, this section, rather than completely excluding maritime contracts from the CDA, simply vests

appeals from the administrative determinations of claims in the district courts, rather than in the Court of Claims or the Court of Appeals for the Federal Circuit. *Whitey's Welding & Fabrication, Inc. v. United States,* 5 Cl.Ct. 284 (1984); *Brennan v. United States,* 641 F.Supp. 245 (D.C.D.C., 1986); *but see Boston Shipyard Corp. v. United States,* 9 Cl.Ct. 450 (1986).

This reading of § 603 is buttressed by the language of § 602(b) which states in part "Notwithstanding any other provision of this chapter, contracts of the Tennessee Valley Authority for the sale of fertilizer or electric power or related to the conduct or operation of the electric power system shall be excluded from the chapter." When Congress meant to exclude a whole class of contracts from the CDA, it knew precisely how to do so.

 Because ROSCO failed to provide a certified claim to the contracting officer as required by the CDA, ROSCO's contract claim against the government is dismissed for want of subject matter jurisdiction.[6]

**B. Maritime Lien Claim**

The maritime lien claim may proceed only under the PVA. I find that the USNS SEALIFT ATLANTIC is a public vessel of the United States as defined in the PVA. I further hold that because a maritime lien arises on the theory that the vessel is the "offending thing," the USNS SEALIFT ATLANTIC "caused" the damages complained of within the meaning of the PVA. Thus, the plaintiff has a remedy under the PVA. The PVA remedy is exclusive and suit may not be pursued under the SAA. *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 181, 96 S.Ct. 1319, 1328, 47 L.Ed.2d 653 (1976).

 46 U.S.C. § 788 forbids liens against public vessels. Section 788 provides "Nothing contained in this chapter shall be construed to recognize the existence of or as creating a lien against any public vessel

6. *See, Fidelity Construction Co.,* 700 F.2d at 1383–84; *Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1156–57 (5th Cir.1981).

of the United States." Therefore, the United States is entitled to summary judgment[7] dismissing the maritime lien claim against the United States.

### C. Tort Claim

ROSCO alleges that MTL tortiously interfered with its contract with its subcontractor Sabine. The government contends that ROSCO's claim is not a maritime tort and therefore that it is barred by the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(h) which forbids suit against the United States on claims arising out of interference with contract rights. ROSCO argues that the tort is maritime, and that therefore the FTCA is inapplicable.

There is a two-part test for determining whether a tort is maritime or not. The injury complained of must occur on navigable waters and must be related to traditional maritime activities. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). The second part of this test is easily satisfied in this case. The making of contracts to repair ships is a traditional maritime activity. *North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 126–28, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1919).

More difficult to establish is the "location" of this tort. The government argues that the only harm caused by this "tort" was suffered by ROSCO, and that ROSCO is not on navigable waters. Nevertheless, a tort may be maritime if its effects are felt on navigable waters. *Carroll v. Protection Maritime Insurance Co.,* 512 F.2d 4, 6–7 (1st Cir.1975). The location test has been stretched far enough to encompass a claim by seamen against an insurance company for "blacklisting" them for making injury claims. *Id.*

ROSCO alleges at least as significant an impact in the admiralty jurisdiction. It claims that the change demanded in subcontractors delayed the completion of the work on the SEALIFT ATLANTIC, thereby keeping it off navigable waters, just as the blacklisted seamen were kept from navigable waters in *Carroll.* Given the broad definition given to the locality test, this impact is enough to satisfy it.

Furthermore, *The Poznan,* 276 Fed. 418 (S.D.N.Y.1921) (L. Hand, J.), holds that tortious interference with a maritime contract is always within the admiralty jurisdiction. This case predates *Executive Jet,* but it forms the basis for a small but growing line of authority providing an exception to the locality test for intentional torts tightly "interwoven" with a maritime contract. *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.,* 625 F.Supp. 794, 799 n. 6 (S.D.Tex. 1986); 2 *Benedict on Admiralty* 1–51 (1985).

■ The tort alleged by ROSCO is a maritime tort. The FTCA does not apply, whether this claim is brought under the SAA or the PVA.[8] 28 U.S.C. § 2680; *McCormick v. United States,* 680 F.2d 345 (5th Cir.1982).

Tortious interference with contracts is a cause of action under the federal maritime law. *The Poznan,* 276 Fed. at 433–34. ROSCO alleges an unusual form of the tort. One would expect Sabine to complain about interference with contractual relations, not ROSCO. Nevertheless, this tort does exist, at least in theory, under Restatement (Second) of Torts § 766A. The argument is that MTL prevented ROSCO from performing its contract with Sabine, which prevented Sabine from performing

---

7. *See Marine Coatings of Alabama, Inc. v. United States,* 792 F.2d 1565, 1567 (11th Cir.1986).

8. The same problem arises with respect to an intentioinal maritime tort as arose with respect to the contract claim. It is not obvious how a vessel can intentionally interfere with a contract. If the vessel did not cause the tort, however, the shoreside employees or agents of the government did, and the SAA provides a remedy where there would be one against a private person. Therefore, if the PVA does not provide a waiver of sovereign immunity in this situation, the SAA would. *See Olympia Sauna Compania Naviera, S.A. v. United States,* 604 F.Supp. 1297, 1300–03 (D.Or.1984), *remanded without opinion,* 774 F.2d 1174 (9th Cir.1985).

its contract with ROSCO, which resulted in the substitution of Marine Coatings, which cost ROSCO money. ROSCO cites no authority for this somewhat novel use of § 766A, and I suspect ROSCO has failed to state a cause of action in tort. Nevertheless, on this record I cannot say that ROSCO could not make out some set of facts that would entitle them to relief on a tort theory.[9]

## IV. Conclusion

In accordance with the foregoing reasons, the motion of the defendants is GRANTED IN PART and DENIED IN PART.

9. Although ROSCO is entitled to proceed on its maritime tort claim, 46 U.S.C. § 745 bars the granting of prejudgment interest against the United States. Accordingly, the claim for prejudgment interest against the United States must be dismissed.