346 F.2d 449
 Sarah SMITH, Administratrix of the Estate of John C. Smith,
Deceased, and George Thomas Holley, Appellants,
v.
UNITED STATES of America and Marine Transport Lines, Inc.,
as owners of theU.S.N.S. POTOMAC, for exoneration
from or limitation of liability, Appellees.
 No. 9704.
 United States Court of Appeals Fourth Circuit.
 Argued Feb. 3, 1965.
Decided May 3, 1965.
 
 Donald E. Klein, New York City (Schwartz & O'Connell, new York City, William K. Rhodes, Jr., Wilmington, N.C., and Amato, Babalas, Breit, Cohen, Rutter & Friedman and C. Arthur Rutter, Jr., Norfolk, Va., on brief), for appellants.
 Louis R. Harolds, New York City (Harvey Goldstein, New York City, on brief), for The American Trial Lawyers Ass'n, amicus curiae.
 William E. Gwatkin, III, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Morton Hollander and Leavenworth Colby, Attys., Dept. of Justice, and Robert H. Cowen, U.S. Atty., on brief), for appellees.
 Before BRYAN and BELL, Circuit Judges, and CHRISTIE, District Judge.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 In this maritime cause the question is whether in its contract with the United States for the management of United States Naval Ship (USNS) Potomac, Marine Transport Lines was an 'agent' within the intent of the Public Vessels Act, 46 U.S.C. 781-782. The decisive term appears in the following proviso which is engrafted by and upon that act from the Suits in Admiralty Act, 46 U.S.C. 741, 745, both allowing an in personam libel against the United States:
 
 
 2
 '* * * Provided, That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States * * * whose act or omission gave rise to the claim. * * *'
 
 
 3
 The District Judge concluded that Marine was such an agent. We hold he was right.
 
 
 4
 The decision meant that the appellants, Potomac crewman George Thomas Holley and the personal representative of crewman John C. Smith, could not sue Marine, but could sue only the United States, for damages for injury to Holley and the death of John Smith. These misfortunes, they charged, were the result of a fire and explosion, caused by Marine's negligence, aboard the Potomac at Morehead City, North Carolina, September 26, 1961. The vessel was a complete loss, the cost to refloat and repair exceeding her value.
 
 
 5
 Appellants' complaint is that the ruling of the District Judge deprived them of the jury trial guaranteed by the Jones Act, 46 U.S.C. 688, for now their only recourse is a suit against the Government under the Public Vessels Act before the admiralty judge. The issue arose in proceedings initiated by the United States and Marine for exoneration or limitation of liability for the catastrophe. 46 U.S.C. 183 et seq.; Supreme Court Admiralty Rule 51. Prosecution in any other forum against the United States and Marine of claims arising from the disaster was restrained. Each of the claimants moved for modification of the injunction to allow them to file actions elsewhere against Marine under the Jones Act with a jury trial, in the event exemption, exoneration or limitation were denied Marine. Save to permit the filing of protective suits against the bar of time pending determination of the issue here, the District Court denied the motions. From that ruling this appeal is prosecuted; it was allowed by special leave under 28 U.S.C. 1292(b).
 
 
 6
 The Potomac, a Navy tanker owned by the United States, was a public vessel. Employed exclusively in hauling petroleum products to various military bases for national defense, she was under the direction and control of the Military Sea Transportation Service (MSTS). Subject to the other provisions of the contract with the Government, which was dated June 22, 1961, Marine undertook to 'manage and conduct the business regarding the operation of such tankers', including the Potomac, 'as may be furnished to it by the Government from time to time. * * *'
 
 
 7
 Contrary to claimant-appellants' assertion that Marine was in control of the vessel as a principal and not as an agent, we think the relevant portions of the agreement clearly demonstrate that the United States remained in control of the vessel at all times, with only her physical conduct delegated to Marine. In this Marine was acting solely as the Government's agent, an agent within the intent of the Public Vessels Act. With the particularly relevant portions emphasized, the key paragraphs are these:
 
 
 8
 '(b) The Contractor undertakes and promises to manage and conduct the business of the Government with respect to such tankers in accordance with such written directions or orders as to voyages and cargoes as the Government may from time to to time prescribe, and upon the terms and conditions herein provided, * * *. Commander Military Sea Transportation Service will issue to each Contractor operating instructions, which may be revised and supplemented from time to time. The Contractor shall authorize the Master of each tanker, in the Contractor's behalf, to receive and carry out orders, directions or instructions as regards employment of the vessel and prosecution of voyages, which may be issued by Commander Military Sea Transportation Service, * * *.' Article 1.
 
 
 9
 'All tankers utilized in the operation of the contract are owned by the Government and are public vessels. * * * Article 2.
 
 
 10
 '(a) The Contractor shall operate the tankers in such services as the Government by written or telegraphic order may direct, * * *.
 
 
 11
 '(b) The Contractor shall equip, fuel, supply, maintain, man, victual and navigate the tankers.
 
 
 12
 '(c) The Contractor shall procure all personnel necessary to fill the complement of each tanker subject to the limitations listed below:
 
 
 13
 '(2) Any Master of Chief Engineer so procured and the compensation to be paid therefor shall be subject to approval by the Contracting Officer. * * *
 
 
 14
 '(6) * * * no deck or engineer officer shall be employed on any tanker unless he is a member of the United States Naval Reserve. * * *
 
 
 15
 '(9) The officers and members of the crew shall be subject only to orders of the Master or Contractor. All personnel of the Contractor employed in the performance of work under this contract, including the Master, other officers and crew members shall be employees of the Contractor at all times and not of the Government.' Article 5.
 
 
 16
 With its compensation put on a fixed fee basis, the Contractor was to be reimbursed for the costs incurred in the management and maintenance of the tanker. A part of the allowable costs were these:
 
 
 17
 '(i) Crew expenditures accruing during the term hereof in connection with the tankers hereunder, including
 
 
 18
 (a) Wages * * *, damages or compensation for death or personal injury * * *.' Article 8.
 
 
 19
 Insurance, the agreement directed, was to be taken out by the Contractor if required by the Government. In addition to its covenant to indemnify the Contractor for an uninsured responsibility, the Government was to be the dominus litis in the defense of all uninsured claims against the Contractor. Thus it was agreed that:
 
 
 20
 '(b) The contractor shall be reimbursed by the Government (1) for the cost of such insurance as may be required or approved by the Government; and (2) for liabilities of the Contractor to third parties * * * for * * * death or bodily injury not compensated by insurance or otherwise, arising out of the operation of the tankers in the performance of this contract, whether or not such liabilities are caused by the negligence of the Contractor, * * * provided such liabilities are represented by final judgments * * *.
 
 
 21
 '(d) The Contractor shall give the Government immediate notice of any suit or action filed, or any claim made, against the Contractor arising out of the performance of this contract, the cost and expense of which is reimbursable to the Contractor under the provisions of this contract, and the risk of which is then uninsured or in which the amount claimed exceeds the amount of insurance coverage * * *. If the liability is not insured, the Contractor shall, if required by the Government authorize representatives of the Government to settle or defend any such claim and to represent the Contractor in or take charge of any litigation in connection therewith.
 
 
 22
 '(e) * * * all officers and members of the crew of said tankers * * * shall be deemed to be third parties, and not employees of the Government.' Article 14.
 
 
 23
 Article 29 expressly empowered the Government to terminate the employment of the master or any member of the crew whose continued retention was considered prejudicial to the interest of the United States.
 
 
 24
 The Operating Instructions, which the Commander MSTS issued to the Contractor pursuant to the contract, further accent the constant control of the Government, with Marine only to run the ship as its agent. Specifying explicitly and in detail the responsibilities of the Contractor, they begin with the requirement that the ship carry the certificate of the Navy Secretary declaring the ship's status as a public vessel. They stress the continuing national character of the ship, underscoring the entitlement of the vessel to all the sovereign immunities and privileges of any Navy ship, including those of international and diplomatic stature, which Marine on its own could neither enjoy nor insist upon.
 
 
 25
 Just how the respective positions of the Government as principal, and Marine as agent, could have been drawn more distinctly is not readily conceivable. While there may be a variation in the interrelation of the crew and the Government in the two agreements, the present contract structures no less an agency than that constituted by the contract considered in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), and there held to retain for the Government the same control which we now find. On this precedent we found in Williams v. United States, 228 F.2d 129 (4 Cir. 1955) cert. den. 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499, the physical operator of the Government ship to be such an agent as the Public Vessels Act declares immune from suit.
 
 
 26
 The argument of the claimants that by the agreement Marine was, in effect, shipowner as well as the crew's employer rests on their interpretation of the contract as a splicing of two charter parties; a bare-boat charter out of the Government to Marine with a time charter back from Marine to the Government. The result, say the appellants, is not simply Marine's appointment as an agent but rather its creation as a charterer, an owner pro hac vice or other independent contractor with the same incidents of possession and control as an owner. Cf. Reed v. Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). On these premises it is said that Marine is subject to suit under the Jones Act before a jury, should exoneration or limitation not be granted Marine.
 
 
 27
 As proof of their argument claimants refer primarily to the contract stipulations that the ship's company shall not be considered employees of, but rather as third parties towards, the Government. The very terms of the present contract, claimants contend, were deliberately and intentionally chosen to remove the crewmen from the classification of Government employees, so as to reserve to them all the subsisting remedies of seamen as against Marine. The current contract, they aver, was substituted for the previous General Agency Agreement to avoid this classification, for that agreement put the ship's complement in the objectionable category. Cosmopolitan Shipping Co. v. McAllister, supra, 337 U.S. 783, 69 S.Ct. 1317; Hanlon v. Waterman Steamship Corporation, 265 F.2d 206 (2 Cir. 1959), cert. den. 361 U.S. 822, 80 S.Ct. 69, 4 L.Ed.2d 67; Williams v. United States, supra, 228 F.2d 129 (4 Cir. 1955).
 
 
 28
 Appellants are mistaken. Whether the agreement constituted Marine a charterer, an owner pro hac vice or an independent contractor is merely an academic ascertainment. In any of these capacities Marine could still be an agent. An owner pro hac vice is a charterer, and its competency to act as an operating agent has been expressly recognized. Reed v. Yaka, supra, 373 U.S. 410, 412, 83 S.Ct. 1349; United States Shipping Board Emergency Fleet Corp. v. Greenwald, 16 F.2d 948, 951 (2 Cir. 1927). An independent contractor too may be an agent; the terms are not mutually exclusive. Restatement, Agency, 2d., 14N. However acting, Marine could sign on sailors as its employees. But the question here is not whether the Potomac's crew were employees of Marine, nor whether Marine is to be categorized as a bare-boat or time charterer, an owner pro hac vice, or an independent contractor. Indeed, the contract may have established a relation sui generis, not fitting into any of these terminologies, but that, again, is not the issue. The question now determinative is whether Marine was an 'agent'.
 
 
 29
 The desired alteration of the seaman's status was achieved, certainly in part, in the new form of contract by the express provision that they should not be employees of the United States. The change benefitted the seamen in that it confirmed that they should not be restricted, as Government employees, to relief under the Federal Employees Compensation Act, 5 U.S.C. 751-803. They have still, by virtue of the Public Vessels Act, the traditional remedies of seamen, as well as suit under the Jones Act, but these are now enforceable against the Government in the place of the actual navigator of the vessel. Thus the seamen are assured a solvent respondent. However, the innovation did not affect, or purport to affect, the relationship between the Government and the manager of its ship, that is of principal and agent.
 
 
 30
 The intent of the 1950 amendment to the Suits in Admiralty Act, promulgating the proviso excluding the agent from suability, was not to keep alive the liability of a private person, firm or corporation having charge of a Government ship. It was just to the contrary. It was the adoption by Congress of the exclusivity principle enunciated in Cosmopolitan Shipping Co. v. McAllister, supra, 337 U.S. 783, 69 S.Ct. 1317. Another purpose was to designate unequivocally the one to whom a claim for loss caused by the Government's ship should be directed, and to afford extra time for suit by those who had before erroneously proceeded against the contractor. The legislative history avows this intent and object of the Act. Sen.Rep.No.1782, 81st Cong.2d Sess. (1950); 1950 U.S. Code Cong. Service, p. 4209. As we find MSTS has not endeavored to do so instantly, the question is not before us of whether it can legally execute a contract in which the manager of the ship is not the Government's agent and so without the immunity conferred by the 1950 Amendment. Cf. 10 U.S.C. 2306(a) and 32 CFR 1.401(c) and 1.402.
 
 
 31
 Marine's recourse to the limitation statute, even with the joinder of the United States, does not concede or imply that Marine was the principal rather than an agent in the ship's management. The statute contemplates access to the limitation proceeding for the resolution of doubts as to liability as well as the determination of the extent of it. See British Transport Commission v. United States, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957); Star Brick Corp. v. Johnson, 262 F.2d 251 (2 Cir. 1959); Petition of Spearin, Preston & Burrows, 190 F.2d 684, 686 (2 Cir. 1951). Indeed, claimants' attribution of character or owner pro hac vice to Marine vouches it as one privileged to seek the lee of the limitations act, for the statute expressly harbors charterers who, like Marine, 'man, victual and navigate' the vessel. 46 U.S.C. 186. That it was a haven the Potomac might enter is acknowledged by the authority the appellants cite. Petition of the United States, 155 F.Supp. 714 (D.Del.), affirmed 259 F.2d 608 (3 Cir. 1958).
 
 
 32
 Continuance under the contract of the immunity accorded the agent by the statute is not put in doubt by the fact that judgments against Marine have, with the knowledge of the United States, been entered for personal injuries or other liabilities. E.g. Chowaniec v. United States (S.D.N.Y.1956) 149 F.Supp. 251. The fact is, too, that the agreement speaks of 'judgments' which might be rendered against Marine in the course of the contract. But in the same context the agreement provides for acceptance of the agent's 'settlements approved in writing by the Government'. This tolerance and these provisions merely indicate that the Government has or may allow judgments against Marine as fair ascertainments of the amounts for which the agent seeks reimbursement. In no event, however, could the Public Vessels Act be nullified by practice or agreement.
 
 
 33
 Congress unquestionably had the power to withhold from a crewman shipping on a publicly owned, but privately managed, cargo vessel the right to sue the contractor. Anniston Manufacturing Co. v. Davis, 301 U.S. 337, 341-343, 57 S.Ct. 816, 81 L.Ed. 1143 (1937); Crowell v. Benson, 285 U.S. 22, 45, 52 S.Ct. 285, 76 L.Ed. 598 (1932). The evident reason for the exemption is that, as the United States binds itself to hold the agents harmless against liabilities arising in the conduct of the ships, it is in reality the respondent to all such claims. For the same reason a jury trial is withheld, the United States seldom leaving to a jury the determination of the sum to be assessed for its liability. The withdrawal of a jury trial is altogether permissible. Maricopa County v. Valley National Bank, 318 U.S. 357, 63 S.Ct. 587, 87 L.Ed. 834 (1943); Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).
 
 
 34
 Our conclusion is that Marine should now be declared exonerated, by reason of the statute, of any liability to the appellant-claimants. As this in effect was the conclusion of the District Court, its judgment will be affirmed.
 
 
 35
 Affirmed.
 
 
 36
 J. SPENCER BELL, Circuit Judge (dissenting).
 
 
 37
 I cannot agree with the majority because I do not construe the Suits in Admiralty Act as barring recovery in this case against Marine Transport Lines, Inc. (hereinafter Marine). Certainly, I cannot agree with the assertion of the district court that the exclusivity provisions of that Act may, at the option of the Government, be made applicable when the total claims exceed the amount of the insurance coverage. This would place an intolerable burden upon claimants who would have no way of ascertaining either from public statutes or regulations who is a proper party defendant before suit is brought.[1] Furthermore, the majority consoles the claimants in the instant case with the reminder that the United States is a solvent respondent, but it ignores the fact that they are being denied some of the benefits of a Jones Act suit, including the invaluable right to a jury trial.
 
 
 38
 46 U.S.C.A. 781 provides that a libel in personam may be brought against the United States in cases involving public vessels, and 46 U.S.C.A. 782 incorporates in the Public Vessels Act the provisions of the Suits in Admiralty Act. 46 U.S.C.A. 742 makes a libel in personam against the United States available in any case in which a proceeding in admiralty could have been maintained against a privately owned vessel had it been involved. 46 U.S.C.A. 741 provides, however, that no public vessel or government cargo may be seized or attached. 46 U.S.C.A. 745 places a two year statute of limitations upon a libel in personam against the United States and further reads:
 
 
 39
 'Provided, That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States * * * whose act or omission gave rise to the claim * * *.'
 
 
 40
 It is my understanding, from these statutes, that a libel in personam may be brought against the United States where a public vessel is involved and that if the injury is caused by an agent or employee of the United States, the remedy against the United States is exclusive, i.e., the agent or employee may not be sued. I cannot read these statutes as saying that a suit may not be brought against an independent contractor engaged in business with the United States, even if he is using a public vessel and his business involves the public defense. I reach this conclusion not only from the cases construing struing the Act and its legislative history[2] but also from the large number of cases dealing with the same problem in other fields of military and naval defense procurement.
 
 
 41
 In 1961, when the contract involved in the instant litigation was entered into, the parties thereto were well aware of the Supreme Court's decision in 1949 in the Cosmopolitan case.[3] They knew, as a result of that decision, that they could predetermine by the terms of their contract the respective liabilities of the Government and the operator for negligence resulting in an injury to a seaman aboard a vessel owned but not operated by the Government. They also knew that in 1950 Congress had codified the result of the Cosmopolitan case by enacting the exclusivity provision of the Suits in Admiralty Act which I have heretofore quoted. Furthermore, they were thoroughly familiar with the terms of the old General Agency Agreement and the shipping articles which were construed by the Court in Cosmopolitan. In Cosmopolitan the Court stressed the absence of any demise from the Government. The contract here in article 1(a) states: 'The Contractor * * * shall manage and conduct the business regarding the operation of such tankers as may be furnished to it by the Government from time to time * * *.' This is the language of a demise. In Cosmopolitan the language of the old General Agency Agreement contained no limitation as to voyages and cargo; instead straight agency language was used. In this contract article 1(b) states that 'the Contractor undertakes to manage and conduct the business of the Government * * * as to such voyages and cargoes as the Government may from time to time prescribe * * *.' This is time charter language. In Cosmopolitan the Court stressed the shipping articles which provided that the seamen were employees of the Government. In this contract it is explicitly provided that the seamen are to be employees of Marine and not of the Government. The parties here were also aware of the line of cases including Hanlon v. Waterman S.S. Co., 265 F.2d 206 (2 Cir.), cert. denied, 361 U.S. 822, 80 S.Ct. 69, 4 L.Ed.2d 67 (1959); Williams v. United States, 228 F.2d 129 (4 Cir. 1955), cert. denied, 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499 (1956); and Atlantic Coast Line R.R. Co. v. Agwilines, Inc., 195 F.2d 459 (5 Cir. 1952), holding that where the Suits in Admiralty Act was applicable, suit would have to be brought against the United States alone. In the very teeth of the decisions in Cosmopolitan and these other cases, the Government contracting agency proceeded to draft the contract involved in this case, a document which contains the language of bareboat charter out/time charter in, which carefully avoids the term 'agent' or 'agency' and substitutes therefor the word 'contractor,' and finally which expressly provides that the seamen shall not be employees of the Government.
 
 
 42
 The parties to the present contract also knew that Congress had given to the Secretary and the Assistant Secretary of the Navy authority in negotiating procurement contracts for goods and services for the national defense to 'make any kind of contract that he considers will promote the best interests of the United States,'[4] with certain limitations not pertinent here. See 10 U.S.C.A. 2306(a). In implementing this authority, certain governmental policies were spelled out and appear in 32 C.F.R. 1.1402 (1961):
 
 
 43
 'It is the policy of the Department of Defense * * * to encourage and foster the American merchant marine. Where transportation of supplies by ocean vessels is required:
 
 
 44
 '(a) Private United States vesels shall be employed for the transportation of at least 50 percent of the aggregate gross tonnage per annum of the following categories of supplies * * *.'
 
 
 45
 Section 1.1401(e) defines private vessels to include 'Government-owned vessels under bareboat charter to private operators.'
 
 
 46
 For the reasons previously set forth and in reliance primarily upon Judge Wright's analysis, referred to hereinafter, I think the language of this contract expresses the intent of the parties to create the relationship of independent contractor and that it did in fact create such a relationship between Marine and the Government. In Petition of the United States, 155 F.Supp. 714 (D.Del.1957), Judge Caleb M. Wright painstakingly and meticulously analyzed a contract which is conceded by both parties here to be in all relevant particulars the same as the contract in this case. He came to the conclusion that the petitioner in that case, who stood in the shoes of Marine here, was a 'charterer' or 'owner pro hac vice' under the contract. I can add nothing to the able opinion of Judge Wright except to say that his ruling was affirmed by the Third Circuit, 259 F.2d 608 (1958), in an opinion which quoted the district judge at length and affirmed him in every particular. Judge Wright's opinion was supported by an able brief filed by the Government which pointed out that
 
 
 47
 'This new MSTS[5] combination bareboat charter-out/time charter-back form of charter agreement * * * makes it plain that the vessel is demised and delivered into Mathiasen's control to man, victual, command and navigate by its own expense and procurement, although subject to reimbursement and profit for the service of carrying government cargoes.'
 
 The brief concludes:
 
 48
 'These demise charter provisions make it absolutely clear, as Judge Wright held, that Mathiasen was an owner pro hac vice and a 'charterer' within 46 U.S.C. 186 and entitled to the benefits of the limitations acts.'
 
 
 49
 The claimants in that case raised and the court rejected the same arguments which the Government here advances and this court has accepted in support of the opposite position. I find the Government's former reasoning far more convincing.
 
 
 50
 I think the Public Vessels Act is applicable and thus no question of the waiver of sovereign immunity is here involved, for a public vessel may not be attached or seized even in a collision case. However, the exclusivity feature of the 1950 amendment is not applicable for the reasons I have outlined above. I would not permit Marine to enjoy the privilege of a private operation, including the fixed fee which this contract so clearly grants it, while denying the concomitant rights to its employees, the claimants in this case.
 
 
 
 [1]
 In Chowaniec v. United States, 149 F.Supp. 251 (S.D.N.Y. 1956), a seaman brought a proceeding in admiralty against the Government and a Jones Act suit against Marine. Finding no unseaworthiness, the district court dismissed as to the United States but held Marine under the Jones Act for negligence. The court found that Marine operated, managed, and controlled the vessel under a contract with the owner and hence was liable under the Jones Act. In failing to assert the exclusivity provisions of the Suits in Admiralty Act in that case, Marine and the Government took a position inconsistent with the Government's argument here that this is a jurisdictional matter, i.e., that the Military Sea Transportation Service (MSTS) could not by the terms of this contract take the case out of the exclusivity provisions of the Act
 
 
 [2]
 In presenting the 1950 amendment to the Suits in Admiralty Act, which added the exclusivity provision in 46 U.S.C.A. 745, the report by the Senate Committee on the Judiciary contained this language:
 'This bill will not in any way change the existing rights of seamen, under either the Jones Act or the general maritime law, to bring suits in admiralty or at law against their private employers who operate, under bareboat charter or similar arrangements, vessels which are merely owned by the Government.' S.REP.No.2535, 81st Cong., 2d Sess. (1950), 1951 Am.Mar.Cases 149-150.
 
 
 [3]
 Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949)
 
 
 [4]
 It has long been the policy of the Government and the Department of Defense to foster and encourage free enterprise and private business in public defense activities. Cf. Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950), where the Court held that the employees of a private contractor operating a Government-owned munitions plant under a cost plus a fixed fee contract were not employees of the Government within the meaning of the Fair Labor Standards Act. The Court said there:
 'we find in these contracts a reflection of the fundamental policy of the Government to * * * use, as much as possible (in the production of munitions), the experience in mass production and the genius for organization that has made American industry outstanding in the world. The essence of this policy called for private, rather than public, operation of war production plants. * * * In this light, the Government deliberately sought to insure private operation of its new munitions plants.' 339 U.S. at 506-507, 70 S.Ct. at 760.
 See also Anselmo v. Ailes, 235 F.Supp. 203 (E.D.N.Y. 1964), where the court held that United States was not responsible for the alleged wrongful discharge of certain employees at a missile base merely because it had inserted many detailed rights of supervision in the contract to insure that the contract was properly performed and that its money was not wasted.
 
 
 [5]
 Under the regulations it is the function of MSTS, under whose aegis the contract in this case was made, to coordinate all shipping relating to national defense