Pasquale **DIBIASE** Plaintiff,

v.

**UNITED STATES**, Defendant.

Civ. No. 88–0026–P.

United States District Court,
D. Maine.

March 29, 1989.

---

Roderick H. Potter, Saco, Maine, Nathan Greenberg, Boston, Mass., for plaintiff.

Martin R. Johnson, Daniel W. Boutin, Portland, Maine, Richard B. Kydd, Boston, Mass., for defendant.

## OPINION AND ORDER

GENE CARTER, District Judge.

### I. INTRODUCTION

Plaintiff Pasquale DiBiase brings this action seeking damages totalling $1,050,000 for injuries he allegedly suffered while serving as a merchant seaman aboard the USNS POLLUX. Plaintiff claims that his alleged injury gives rise to maritime causes of action sounding in negligence, unseaworthiness, and maintenance and cure, and that the United States, as the vessel's owner, is the proper party to answer for these claims. The Court has jurisdiction over this matter pursuant to 46 U.S.C.App. section 740. The case was tried before the Court, sitting without a jury, and counsel have briefed and argued this action fully. The Court makes the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A. *The USNS POLLUX*

The USNS POLLUX is a roll-on, roll-off container vessel owned by the United States. The vessel, built in 1972, is 944 feet long and has a gross tonnage of 48,000 tons. A speedy ship, capable of some thirty-three knots, the vessel was completely reconstructed in 1986 to serve in its present capacity as part of the supply fleet for the United States armed forces. The vessel is

maintained on call to load and deliver military vehicles and hardware and to be underway within ninety-six hours to wherever it is needed around the globe. At any given time, the vessel's status is either reserve operating status, when the crew is awaiting orders and preparing the ship for a voyage, or full operating status, when the vessel is actually carrying out its orders at sea.

At the time the injury that gives rise to this action allegedly occurred, the United States had contracted with Bay Tankers, Inc. to maintain and operate the vessel for the Government. Under the contract, Bay Tankers was charged with keeping the vessel in a state of preparedness so that it can meet its reserve operating status obligations. The United States, through the Military Sealift Command, retained direction of the vessel's comings and goings, while Bay Tankers provided the maintenance and operation necessary to respond to that direction. The officers and crew of the POLLUX were private employees of Bay Tankers, not government workers.[1]

B. *Potential Liability of the United States under the Suits in Admiralty Act, 46 U.S.C.App. §§ 741 et seq.*

The United States claims that it is not liable for any injury Plaintiff may have suffered, due to the United States' relationship with Bay Tankers concerning the use of the POLLUX. Specifically, the United States claims the affirmative defense that if Plaintiff were injured as alleged, his injuries were due to the negligence and breach of warranties of third parties, specifically Bay Tankers, over whom the United States had no control in its management of the vessel.

■ The basis for this affirmative defense is the United States' claim that the POLLUX, owned by the United States, was under a demise charter to Bay Tankers at the time Plaintiff claims his injury occurred. The demise charter is an instrument for vesting in one person most of the incidents of ownership in the capital asset of that business—the ship— while another retains the general ownership and right of reversion. G. Gilmore and C. Black, *The Law of Admiralty* § 4–20 (2d ed. 1975). Thus, in a demise charter, the possession and control of a vessel is shifted from one person to another, just as the shoreside lease of property shifts many of the incidents of ownership from lessor to lessee.

■ It has long been recognized that the demise charterer is to be treated as the owner for most purposes, including liability for negligence and unseaworthiness of the chartered vessel. *E.g., Reed v. Steamship YAKA*, 373 U.S. 410, 412–13, 83 S.Ct. 1349, 1351–52, 10 L.Ed.2d 448 (1963); G. Gilmore and C. Black, *The Law of Admiralty* § 4–23. The United States contends that Bay Tankers was the demise charterer of the POLLUX, and is therefore liable for any injury that may have occurred to Plaintiff.

■ The Court does not agree that the arrangement under which Bay Tankers operated the POLLUX may be classified as a demise charter. The test for determining the existence of a demise charter is primarily one of control. G. Gilmore and C. Black, *The Law of Admiralty* § 4–21. To create a demise the owner of the vessel must *completely and exclusively* relinquish possession, command, and navigation of the vessel to the demisee or charterer. *Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962); *see United States v. Shea*, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894). The owner bears a heavy burden of showing that a demise charter exists, and the courts are reluctant to find a demise where the dealings between the parties reflect anything

---

**1.** In Plaintiff's Reply to Defendant's Post–Trial Brief, Plaintiff argues that prior to trial, the parties stipulated that Plaintiff was a seaman employed by the United States at the time the accident occurred. Plaintiff attaches an unsigned, undated photocopy of the alleged stipulation, and claims in his brief that the alleged stipulation was filed with this Court on October 19, 1988. Defendant denies the alleged stipulation, claiming in effect that the copy attached to Plaintiff's reply brief was an early draft of a proposed stipulation that never reached fruition. Furthermore, the Court has no record of having received the alleged stipulation. The Court finds that no such stipulation was agreed upon.

short of a complete transfer of control. *Guzman v. Pichirilo*, 369 U.S. at 700, 82 S.Ct. at 1096. The facts in the instant case do not portray a demise charter.

The key feature of the contractual relationship between the United States and Bay Tankers is the level of control retained by the United States. Unlike the demise charter, in which the owner relinquishes all rights of ownership except actual title and reversion, the contractual relationship for the POLLUX is one in which the United States retained an important element of control. The purpose of the contract was for Bay Tankers to maintain and manage the vessel for the Navy as part of the ready reserve fleet. Bay Tankers contracted to maintain the POLLUX in a state of readiness that would permit it to deliver military hardware, under United States Navy orders, within ninety-six hours of notification. If the POLLUX were truly demised to Bay Tankers, the United States would have no right to issue the vessel's orders during the period of demise. This level of control retained by the United States belies its claim to a demise charter of the POLLUX.

Finding that no demise charter existed between the United States and Bay Tankers does not end the Court's inquiry into whether the United States may be liable for Plaintiff's alleged injury aboard the POLLUX. Plaintiff brings this action under the Suits in Admiralty Act, 46 U.S.C. App. §§ 741, *et seq.*, which is incorporated by reference in the Public Vessels Act, 46 U.S.C.App. §§ 781, *et seq.* Section 745 of the Suits in Admiralty Act provides:

> where a remedy is provided by this Act [46 U.S.C. §§ 741, *et seq.*] it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim ...

Under section 745, the remedy provided by the Suits in Admiralty Act, under which Plaintiff brings this action, precludes action against an agent of the United States for acts or omissions that result in injury.

In order to evaluate the United States' suggestion that liability lies with Bay Tanker, as the operator of the vessel, rather than the United States, as the vessel's owner, the Court must address whether Bay Tanker's status in its relationship with the United States constitutes agency.

■ It is well established that a contract operator of a naval vessel, such as Bay Tankers, is an agent of the United States for purposes of section 745 of the Suits in Admiralty Act. For example, in *Smith v. United States*, 346 F.2d 449, 451 (4th Cir.), *cert. denied*, 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965), Marine Transport Lines, a private company, had contracted to "manage and conduct the business regarding the operation" of the USNS POTOMAC, a Navy tanker. The POTOMAC was a public vessel used to haul petroleum products to various military bases for national defense purposes, under the direction and control of the Military Sea Transportation Service (MSTS). *Id.* at 451. Marine Transport Lines' obligation under the contract was to maintain and control the everyday, physical operation of the vessel, with the United States remaining in control of the determination of the vessel's voyages and cargo. The *Smith* court held that Marine Transport was acting as the agent of the United States, within the meaning of the Suits in Admiralty Act as incorporated by the Public Vessels Act. *Id.* Accordingly, the contract limited the source of any recovery for plaintiff's alleged injuries to the United States under the Act.

Other cases addressing similar facts have reached similar results. *Doyle v. Bethlehem Steel Corporation*, 504 F.2d 911 (5th Cir.1974), is on point. The USNS YUKON, a tanker owned by the United States, was operated under contract for the MSTS by Mathiasen's Tanker Industries, Inc. The *Doyle* court granted summary judgment dismissing the plaintiff seaman's claim for damages under theories of general maritime negligence and unseaworthiness against Mathiasen's, finding that Mathiasen's was an agent of the United States for purposes of the Public Vessels Act and the Suits in Admiralty Act. In *Cruz v. Marine Transport Lines, Inc.*, 634

F.Supp. 107 (D.N.J.), *aff'd.* 806 F.2d 252 (3d Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), plaintiff merchant seaman was allegedly injured aboard the USNS SEALIFT COMMAND, owned by the United States and operated under contract by Marine Transport Lines, Inc. The contract between Marine Transport and the United States stated that the vessel "shall be employed solely in the public use or in the protection of the national interest." *Id.* at 111. The *Cruz* court held that the seaman's exclusive statutory remedy was against the United States. *Id.* at 112. *See also River and Offshore Services Co. v. United States,* 651 F.Supp. 276 (E.D. La.1987); *Saffrhan v. Buck Steber, Inc.,* 433 F.Supp. 129 (E.D.La.1977).

■ As in these cases, the facts here indicate an agency relationship between Bay Tankers and the United States for purposes of the Suits in Admiralty Act. Bay Tankers operated and maintained the POLLUX under a contractual agreement[2] with the United States, who retained control over the voyages made and cargo carried by the vessel. The Court concludes that the source of any recovery Plaintiff may make under the Public Vessels Act and the Suits in Admiralty Act for injuries allegedly suffered aboard the POLLUX is limited exclusively to the United States.

### C. *The Alleged Accident*

#### 1.

Having determined that Plaintiff's exclusive remedy under the Public Vessels Act lies against the United States for any injury actually suffered, the Court now sets out its findings of fact concerning Plaintiff's alleged injury. In early April 1986, Bay Tankers took the POLLUX from its home port of Violet, Louisiana, under full operating status, in order to put the vessel through a trial at sea. The reason this sea trial was necessary is that the POLLUX had recently completed major reconstruction for its intended use by the United States Navy as part of the ready reserve

fleet. Bay Tankers, in anticipation of taking full operational control of the vessel, needed to evaluate the vessel's condition for both its own purposes and those of the Navy to be assured that the vessel was fit for its intended service. The voyage took the vessel out through the Gulf of Mexico and up to the Virginia Capes, where the vessel was turned around and returned to its home port.

Present on board the vessel during the sea trials were Damage Control Officers (DCO), who were inspectors from the Military Sealift Command. The purpose of the DCOs' presence on board was to monitor the activities on the vessel and satisfy the Navy of the POLLUX's readiness for duty. On April 10, 1986, as part of the sea trial to determine the vessel's readiness for service, the inspectors ordered a damage control demonstration to be conducted aboard the ship. The demonstration involved fire fighting equipment in the aft portion of the vessel and was under the direction of a DCO.

#### 2.

The fire fighting apparatus and procedure aboard the POLLUX were as follows. The fire pump, which brings in seawater and pumps it up to pressure, is activated in the engine room upon order from the bridge. The engine room, also under orders from the bridge, directs the water under pressure to whichever fire station is needed on the decks. Each fire station is equipped with a fire hose, varying in length between fifty and one hundred feet. A gate valve at each fire station controls the water pressure charged in each hose. At the end of each hose is a nozzle with a three-way valve control. This nozzle can be set to "off," which permits no water to escape, to "fog," or to "stream." The entire fire pump system has a bleeder valve that allows excess pressure to escape the system. The overflow from the bleeder valve is fed into the anchor chain wash.

---

**2.** In the instant case, unlike the cases cited above, the actual contract was not admitted into evidence. The Court bases its conclusions concerning the relationship between the United States and Bay Tankers upon live and deposition testimony admitted at trial.

When water is needed on deck to fight a blaze, the crew unrolls the hoses from the appropriate fire station and the officer on deck contacts the bridge to request water on deck at that fire station. The bridge contacts the engine room and orders the fire pump started and pressure charged to the fire station. Once the fire station is charged, the crew member manning the gate valve at the fire station can control the flow of water to the hose, which is in turn manned by a two- or three-man crew. If excess water pressure builds from the fire pump, it bleeds off via the anchor chain wash.

During a fire fighting situation, the officers and crew assume assigned positions on the vessel. The master remains on the bridge. Often, one of the other officers will remain on the bridge as well. The first officer, second in command to the master, is on the deck, assuming overall responsibility for the fire fighting efforts. The first officer is assisted by the other officers on board, who will supervise the individual fire fighting crews. The remaining crew on deck mans the fire stations and hoses.

### 3.

On the morning of April 10, 1988, when the damage control demonstration took place aboard the POLLUX, the master, Captain Dillon, was on the bridge. Also on the bridge was third officer Michael Tripp. The first officer, Robert Brownell, was supervising the operations on the deck. Also on the deck were second officer William Showers and third officers Kurt Halliard and Michael Tripp, overseeing individual fire fighting crews.

The DCO set up the damage control demonstration aft. Through first officer Brownell, the deck crew was instructed to imagine that there was a helicopter aflame on a deck hatch. Individual crews were assigned to fire stations and hoses were trained upon the imaginary helicopter.

The DCO instructed that the crew on the hose from fire station 68 was to assume that the hose had ruptured. The crew was to get another hose, originating from fire station number 69. Unlike fire station number 68, which is located on the deck,

fire station number 69 is located in a passageway and is intended to be used primarily to fight fires inside the passageway. It features a gate valve like the other fire stations and a one-and-one-half-inch hose, seventy-five feet in length. The crew manned the hose from fire station number 69.

Plaintiff's claim arises out of an accident that allegedly occurred at this point. Plaintiff was one of the seamen working fire station 68 who was instructed to switch to fire station number 69. He assumed the lead position on the hose, with one other seaman, oiler Ronnie Bond, acting as his backup. Plaintiff claims that he and his backup were standing on the hatch, manning the hose, when the hose began to flail about wildly and then threw them both to the deck. Bond was able to land on his feet, but Plaintiff allegedly fell, flat on his back, four feet to the deck below, incurring the alleged injury for which he now seeks damages.

### 4.

Plaintiff claims that his alleged accident was directly the result of negligence on the part of the supervisors of the damage control demonstration. Plaintiff claims it was negligent to assign only two persons to man a fire hose, arguing that three are required for safety purposes specifically to avoid the type of accident he allegedly suffered. Plaintiff also claims that first officer Brownell was negligent in not stopping the damage control demonstration when it allegedly became apparent that the hose from fire station number 69 was too short to reach the hatch safely. Plaintiff claims that the shortness of the hose contributed to his inability to maintain his position atop the hatch when the hose allegedly went wild. Finally, Plaintiff also claims that negligence on the part of the unidentified seaman stationed at the gate valve for fire station number 69 caused the hose to become charged with too much pressure too quickly, resulting in the flailing action that allegedly threw Plaintiff to the deck.

Plaintiff's claim of unseaworthiness also centers around the amount of pressure

sent into the hose. Without specifying the chain of events that would lead to such an occurrence, Plaintiff suggests that faulty equipment allowed excess pressure into the hose on which Plaintiff was serving as lead man. Plaintiff argues that this alleged fault in the water pressure system constitutes an unseaworthy condition which directly contributed to his alleged injury. Finally, Plaintiff claims maritime maintenance and cure, on the basis that he suffered a work-related injury while serving on a merchant vessel at sea.

### 5.

The Court finds that it need not explore Plaintiff's specific claims for negligence, unseaworthiness, and maintenance and cure. Plaintiff has failed to prove by a preponderance of the evidence that an accident occurred on April 10, 1986, giving rise to the injuries for which he seeks damages. The evidence offered by Plaintiff in support of his claim was more than offset by conflicting evidence and testimony that casts substantial doubt upon his claim.

Plaintiff alleged that first officer Brownell, the officer supervising all action on the deck, witnessed the alleged accident. Plaintiff also claimed that Brownell was doused with water from the hose as it allegedly ran amok, and that Plaintiff spoke with Brownell about the accident immediately after the drill was completed. Brownell's deposition testimony was that because he was the chief officer on deck, an accident involving one of his crewmen would have come to his attention. Brownell also testified that he had specific recollection of this demonstration because of the presence of the DCO.

Brownell remembered watching two men use the hose from fire station number 69 without incident, while Brownell stood twenty to thirty feet away. Brownell did not witness an accident to Plaintiff or any of the crew on deck, and he was not hit with any water during the demonstration. Brownell also did not recall conversing with Plaintiff after the demonstration. Third officer Hallier was also involved with the damage control demonstration and testified, by deposition, that he could see all the crews working the demonstration and did not witness an accident to Plaintiff or any other seaman that day.

Plaintiff claims that immediately following his injury, he reported it to first engineer Peter Juntilla, who allegedly instructed him to go to sick bay. Juntilla testified that he does not recall such a conversation. Captain Dillon, the master on the POLLUX that day, testified that as the master, he was in constant communication from the bridge with his officers on the deck. It is the duty of his officers to report any injuries to him so that an entry may be made to the log book and an accident report completed for insurance purposes. No word of an injury to Plaintiff or any other seaman came to him on the deck during the demonstration.

Third officer Hallier also testified that both the ship's log and the medical log, kept in the normal course of operations aboard the POLLUX, would reflect any accident or injury suffered on board. Defendant's Exhibit 1, the medical log of the POLLUX for the period April 1 to April 14, 1986 shows no record of an injury reported by or treatment issued to Plaintiff. Similarly, Defendant's Exhibit 4, the ship's log, reflects the damage control demonstration that began at 10:41 a.m. on April 10, 1986, but records no accident.

Finally, Plaintiff himself testified that he continued to work for another week to ten days until the vessel returned to port, without making any official report of an accident or seeking treatment while on board. When Plaintiff left the vessel, he traveled to New York with both chief engineer Juntilla and Mr. Jasco, who is in charge of personnel for Bay Tankers. At that time Plaintiff reregistered his availability for duty with the union office. Mr. Jasco gave Plaintiff the opportunity for an immediate position aboard another vessel, which Plaintiff turned down without specifying any reason other than simply preferring to return home. Juntilla testified that at no time during the trip to New York did Plaintiff mention any accident or injury, and that Plaintiff appeared willing to take an-

other job if Mr. Jasco had instructed him to do so.

Plaintiff's sole corroborating testimony comes from fellow seaman Ronnie Bond, an oiler on the POLLUX at the time of the alleged accident. Bond's testimony is insufficient to counterbalance testimony to the effect that no accident occurred during the damage control demonstration aboard the POLLUX, the lack of corroboration in the ship's records kept in the normal course of operations aboard the vessel, and Plaintiff's continued service, without complaint, aboard the vessel for a week to ten days after the accident allegedly occurred. Plaintiff has therefore failed to prove by a preponderance of the evidence that he suffered an accident on board the POLLUX on April 10, 1986 as alleged.

Accordingly, it is *ORDERED* that judgment be, and it is hereby, *GRANTED* in favor of the Defendant. Judgment to enter.