Philip A. ROLLINS, as the personal representative of the Estate of Alison Rollins and Priscilla Rollins, individually, Plaintiffs,

v.

The BOARD OF GOVERNORS FOR HIGHER EDUCATION; Peterson Builders, Inc., and the United States of America, Defendants,

v.

JOHN W. GILBERT ASSOCIATES, INC., Third–Party Defendant.

Civ. A. No. 88–0482P.

United States District Court, D. Rhode Island.

March 27, 1991.

---

**934**

John T. Walsh, Jr., Providence, R.I., for plaintiffs.

Howard E. Walker, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Peterson Builders, Inc.

Irving A. Pianin, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C.,
Suzanne G. Curt, Asst. U.S. Atty., Providence, R.I., for U.S.

Berndt W. Anderson, Roberts, Carroll, Feldstein & Peirce, Providence, R.I., Louis Saccoccio, Mary Kennard, Gen. Counsel, University of Rhode Island, Kingston, R.I., for Bd. of Governors.

Barbara S. Cohen, Goldenberg & Muri, Providence, R.I., Augustus F. Wagner, Jr., Nutter, McClennen & Fish, Hyannis, Mass., Leonard W. Langer, Marshall J. Tinkle, Thompson, McNaboe, Ashley & Bull, Portland, Me., for John W. Gilbert Associates, Inc.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

As I have recited on several occasions, this is an action brought by the parents of Alison Rollins under the Jones Act for negligence against the Board of Governors of Higher Education, under general maritime law, the Public Vessels Act and the Suits in Admiralty Act against the United States and under the general maritime and products liability law against Peterson Builders, Inc. Alison Rollins, the plaintiffs' decedent, was a seaman employed by the Board of Governors. On August 11, 1986, Alison was electrocuted while working on the ship end of the ship-to-shore power connection on the research vessel Endeavor. The Endeavor was owned by the United States and chartered to the Board of Governors.

◼ The Board of Education has now filed a motion for summary judgment against plaintiffs Philip and Priscilla Rollins. The Board contends that, as a matter of law, it is immune from prosecution under the exclusivity clause of the Public Vessels Act and the Suits in Admiralty Act. The exclusivity clause provides that

> where a remedy is provided by this Act it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim. 46 U.S.C. § 745.

The provision "precludes recovery against an agent of the United States in any case where the agent or its employees commit a wrongful act on a public vessel or merchant vessel of the United States...." *Le-Blanc v. United States*, 732 F.Supp. 709, 713 (E.D.Tex.1990) (citing *Doyle v. Bethlehem Steel Corp.*, 504 F.2d 911 (5th Cir. 1974)). In the instant case, the Board contends that the exclusivity clause shields it from liability because it is an agent of the United States.

First, it must be noted that the legislative history of the statute states that "[t]he legislation [was] not intended to affect existing rights of seamen against their vessels or against private companies who operate Government-owned vessels.... It merely restates expressly the law presently established by the courts that, where any remedy in admiralty is provided against the United States, such remedy is exclusive of every other type of action by reason of the same subject matter against the United States or against its employees or agents." 1950 U.S.Code and Admin.News at 4209.

Prior to the 1950 amendment of Section 745, there was a good deal of confusion with regard to liability when public vessels operated for the government were involved. Litigants would sue "agents" and discover after the statute of limitations had run that their proper suit was against the United States. To assure that "litigants ... not be made the victims of the legal confusion regarding the proper remedy in such cases," 1950 U.S.Code Cong. and Admin.News at 4210, Congress enacted the 1950 amendment of Section 745. The amendment "was the adoption by Congress of the exclusivity principle enunciated in *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949)." *Doyle*, 504 F.2d at 913. The inquiry is, therefore, directed toward determining whether the entity operating the government-owned vessel is an "agent" under section 745 as it incorporates the *Cosmopolitan* decision.

The *Cosmopolitan* decision "presents questions concerning the liability for injury to third persons of a general agent, who under the terms of the wartime standard form of agency agreement ... manages certain phases of the business of ships owned by the United States and operated by the War Shipping Administration." 69 S.Ct. at 1318. "[T]he issue raised ... is whether such a general agent is liable under ... the Jones Act...." *Id.* 69 S.Ct. at 1318–19.

The Supreme Court, in *Cosmopolitan*, first discussed the purpose of the Jones Act. The Court determined that the purpose of the Jones Act was to "create new rights in seamen for damages arising from maritime torts" against their employers, but saw no purpose "to enforce tort claims ... against others than [the injured seaman's] employer." *Id.* 69 S.Ct. at 1321. Moreover, the court concluded that as welfare legislation the enactment "should not be restricted by common-law concepts of control so as to bar from welfare legislation as independent contractors persons who were as a matter of economic reality a part of the processes and dependent upon the businesses to which they render service." *Id.* The issue, as stated by the Court, was whether "the general agent under the contract ... in question [was] an employer under the Jones Act." *Id.*

"The solution of the problem of determining the employer under [the general agency contract] depends upon determining whose enterprise the operation of the vessel was." *Id.* 69 S.Ct. at 1323.

One must look at the venture as a whole. Whose orders controlled the master and crew? Whose money paid their wages? Who hired the crew? Whose initiative and judgment chose the route and the ports? It is in the light of these basic considerations that one must read the contract. * * * Such words as employer, agent, independent contractor are not decisive. No single phrase can be said to determine the employer. *Id.* 69 S.Ct. at 1323–24.

In *Cosmopolitan*, the Court found that the terms of the contract and the actual conduct of the parties

demonstrate[d] that the United States had retained for the entire voyage the

possession, management, and navigation of the vessel and control of the ship's officers and crew to the exclusion of the general agent. * * * The general agent agree[d] 'to manage and conduct the business for the United States, in accordance with such directions, orders, or regulations as the latter ... prescribed.' The general agent engage[d] itself to 'maintain the vessels in such trade or service as the United States may direct' [and] to 'collect all moneys due the United States' under the agreement.... *Id.* 69 S.Ct. at 1324.

Moreover, all employees procured by the agent were to be "paid in the customary manner with funds by the United States...." *Id.* The duties of the general agent "were expressly and intentionally limited ... [the general agent] ha[d] no part in the actual management or navigation of the vessel." *Id.* 69 S.Ct. at 1324. "[T]he United States through the master of the ship retained full control over the navigation and physical operation of the vessel." *Id.* 69 S.Ct. at 1324–25.

■ In *Cosmopolitan,* the general agent had shoreside and accounting responsibilities. It procured employees and made them available to the master of the vessel who was an employee of the United States. At sea, the master, an employee of the United States, was in full control and it was while the vessel was at sea that the plaintiff fell ill and alleged that his illness was aggravated by the negligence of the master. The Court held that the general agent who had only procured the seaman was not liable under the Jones Act as the seaman was an employee of the United States. The Court specifically stated that it was essential that the masters and crews be government employees in order to obviate strikes and work stoppages, to insure sovereign immunity for the vessel, and to preserve wartime secrecy by confining all litigation concerning operation of the vessel to the admiralty courts where appropriate security precautions could be observed. The service agreements, therefore, provided that the officers and men to fill the complement of the vessel should be procured by the general agent through the usual channels upon the terms and conditions customarily prevailing in the services in which the vessels were to be operated. These men, however, were to be hired by the master of the ship and were to be subject to his orders only. The responsibility of employing the officers, so the Regulations show, was vested exclusively in the master, and the men so hired became employees of the United States and not of the general agent. *Id.* 69 S.Ct. at 1325–26.[1]

The Court's analysis led it to conclude that "an agent such as Cosmopolitan, who contracts to manage certain shoreside business of a vessel operated by the War Shipping Administration, is not liable to a seaman for injury caused by the negligence of the master or crew of such a vessel." *Id.* 69 S.Ct. at 1326. This conclusion is in line with the statement in the legislative history of the 1950 amendment to Section 745:

the agent, while liable for the negligence of its own employees, was not liable for the negligence of the civil-service masters and crews with whom the United States manned the vessels. For the negligence of those, the United States was the only responsible party. 1950 U.S. Code Cong. and Admin.News at 4210.

This Court, therefore, concludes that the definition of an "agent" under Section 745 is governed by the reasoning and holdings articulated in *Cosmopolitan.* A general agent is shielded from liability when three criteria are met: 1) the agent is performing work of the United States 2) the agent is not an "employer" of the injured seaman for Jones Act purposes and 3) the negli-

---

1. This does not, however, lead to the conclusion that the 1950 amendment was only applicable during wartime. *Doyle,* 504 F.2d at 912. "Since 1950 the wording of the Suits in Admiralty Act, specifically 46 U.S.C.A. § 745, has remained unchanged by Congressional amendment. The 24 years which have ensued since the date of the amendment have seen both armed conflict and peace. The language of the statute, the same now as then, does not limit the exclusivity provision of the Act to times of war...." *Id.* at 913.

gence is not directly attributable to the agent's own employees.

To assure that the Congressional purpose of alleviating "the legal confusion regarding the proper remedy," 1950 U.S.Code Cong. and Admin.News at 4210, in such cases is accomplished, "[c]ourts have construed [section 745] broadly in order to eliminate the uncertainty about who an individual should sue for an injury caused by or occurring on a public vessel." *LeBlanc,* 732 F.Supp. at 713 (citations omitted). The focus has been on whether the "agent" was doing the business of the United States—exclusively.

In the instant case, the Board argues that "[s]everal different standards have been enunciated by the courts in determining what constitutes an agency relationship." For this proposition, the Board cites to a number of cases including *Petition of United States,* 367 F.2d 505 (3d Cir.1966), *LeBlanc,* 732 F.Supp. 709, *Bowman v. Pan American World Services, Inc.,* 704 F.Supp. 695 (E.D.La.1989), *Cruz v. Marine Transport Lines, Inc.,* 634 F.Supp. 107 (D.N.J.1986) and *Saffrhan v. Buck Steber, Inc.,* 433 F.Supp. 129 (E.D.La.1977). From these cases, the Board concludes it is an agent of the United States because with regard to its activities on the Endeavor it is a fiduciary of the United States, owing the government obedience and loyalty, *see, e.g., Petition of U.S.,* 367 F.2d at 509, it is subject to the United States' overall control and direction, *see, e.g., Cruz,* 634 F.Supp. at 110, and that it was clearly operating on behalf of the United States. *See, e.g., Bowman,* 704 F.Supp. at 697, n. 10. Although the cited cases do set out these standards, the Board misses the main thrust of the precedent. In the cited cases, the "agent" was doing the business of and for the United States.

For instance, in *Petition of United States,* the court noted that Section 745 was "concerned with the situation of a vessel both owned by the United States and engaged *exclusively* in the business of the United States." 367 F.2d at 512 (emphasis added). In *Cruz,* the vessel was involved in the transportation of petroleum for the United States Department of Defense. The United States had "exclusive operational control" and the vessel was used " 'solely in the public use or in the protection of the national interest.' " 634 F.Supp. at 111. In *Bowman,* the "agent's" job was to "provide and perform Technical Support Services at the National Space Technology Labs in support of NASA...." 704 F.Supp. at 697. The "agent" was conducting the business of the United States "pursuant to a contract ... and the United States retained ultimate control over the vessels and operations." *Id.* at 698. Finally, in *LeBlanc,* the agent "operated the vessel for the United States exclusively in non-commercial public service, acting as a general agent" of the government. 732 F.Supp. at 714. The import of these cases is that an entity doing the work of the United States on a public vessel is in a true fiduciary relationship with the United States. In such cases, Congress saw fit to shield the "agent" from liability and essentially assert that the injured seaman would be considered an employee of the United States for Jones Act purposes. The legislative history makes clear that the 1950 amendment of Section 745 was "not intended to affect existing rights of seamen against ... private companies who [merely] operate Government-owned vessel...." 1950 U.S.Code Cong. and Admin.News at 4209.

■ The plaintiff and the United States have both submitted oppositions to the Board's motion for summary judgment. The focus of the oppositions is that the charter party contract between the United States and the Board specifically states that:

In the conduct of operations utilizing the Vessel provided under this Charter Party, the Charterer shall not act as or be considered as agent for the Government, and no provision of this Charter Party is intended to nor shall be deemed to establish or create an agency relationship between the parties hereto.

The contract, however, is not controlling.[2] "[T]he proper focus is [the putative agent's] relationship with the United States." *LeBlanc*, 732 F.Supp. at 714. "Such words as employer, agent, independent contractor are not decisive." *Cosmopolitan*, 69 S.Ct. 1317; *see Smith v. United States*, 346 F.2d 449, 452–53 (4th Cir. 1965) (terms of the agreement are not controlling); *Lovetro v. United States*, 602 F.Supp. 574, 575 (S.D.N.Y.1984) (citations omitted) ("'[w]hether the agreement constituted [the defendant] a charterer, an owner *pro hac vice* or an independent contractor is merely an academic ascertainment. In any of these capacities [the defendant] could still be an agent.'"). Nor is the indemnity-hold harmless clause of the contract controlling. Agreements to hold harmless the United States do not affect statutory rights. *Saffrhan*, 433 F.Supp. at 134. The remedial purpose of the 1950 amendment, to eliminate confusion regarding the proper party to suit, would not be accomplished by relying solely on contract terms to decide the agency issue. The injured seaman is not a party to the contract and would have no reason to know the details of the contractual relationship between the "putative agent" and the United States. It is the conduct of the parties in light of the contract terms governing such conduct that controls the agency determination; not merely the intentions of the parties.

On a motion for summary judgment, the provisions of Fed.R.Civ.P. 56 must be met: the papers filed must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1106 (1st Cir.1989). In the instant case, there are important material facts in dispute; there is a battle of the affidavits. Basically, the Board contends that it does, exclusively, the work of the United States. Affidavit of John F. Bash. The plaintiff states the contrary. Affidavit of William C. Bruning. There is substance in the dispute; "it limns differing versions of the truth which a factfinder must resolve...." *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). This Court is aware of the conflict of interest problems raised by this motion for summary judgment. Therefore, the Board's motion for summary judgment will be set down for an evidentiary hearing on April 16, 1991 at 2:00 p.m.

At that time, the parties will be expected to present evidence in accordance with this opinion with regard to whether the Board was acting as a "fiduciar[y] for the United States, with the United States' general control and direction." *LeBlanc*, 732 F.Supp. at 714 (citing *Petition of U.S.*, 367 F.2d at 509, *Cruz*, 634 F.Supp. at 107). The parties will speak to whether "[t]he vessel's business was [being] conducted *for* the United States, in accordance with direction, orders and regulations as promulgated by the United States and in a fashion protecting the interests of the United States." *LeBlanc*, 732 F.Supp. at 714. (emphasis in original). This will include arguments regarding the funding that the Board receives from federal agencies and the implications of such funding. Finally, there must be evidence regarding the terms of the decedent's employment.

---

**2.** To avoid the clear language of the contract, the Board argues that "[i]f the surrounding facts evidence an agency relationship, however 'artfully disguised,' the parties cannot negative its existence by representing that it is something other than an agency relationship." *Northern v. McGraw–Edison Co.*, 542 F.2d 1336, 1343 n. 7 (8th Cir.1976) (franchisees action against franchisor of dry cleaning establishments), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544), citing, *inter alia, Cerniglia v. Pretty*, 674 F.Supp. 1167, 1171–72 (D.Md.1987) (suit by buyers of liquor business against, among others, the sellers, claiming fraud). Although this assertion is essentially correct, the cited cases are inapposite. Analogizing to cases outside of the admiralty context is not appropriate because to define "agency" under the statute a court must consider the purpose of the specific statute. In fact, the Supreme Court has stated that under the Jones Act, common law agency concepts are not controlling. *See Cosmopolitan*, 69 S.Ct. at 132.